**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FERNANDO BELMONTES, JR.,
                *Petitioner-Appellant,*

v.

ROBERT L. AYERS, JR., Warden for
the California State Prison at San
Quentin,

                *Respondent-Appellee.*

No. 01-99018

D.C. No.
CV-89-00736-DFL

OPINION

Appeal from the United States District Court
for the Eastern District of California
David F. Levi, District Judge, Presiding

Argued and Submitted
May 15, 2007—San Francisco, California

Filed June 13, 2008

Before: Stephen Reinhardt, Diarmuid F. O'Scannlain, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge O'Scannlain

**COUNSEL**

Eric Multhaup, Mill Valley, California, and Christopher H. Wing, Sacramento, California, for the petitioner-appellant.

Edmund G. Brown, Jr., Attorney General for the State of California, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen, Deputy Attorney General, and Mark A. Johnson, Deputy Attorney General, Sacramento, California, for the respondent-appellee.

**OPINION**

REINHARDT, Circuit Judge:

Once again we are presented with a case in which an individual sentenced to death received inadequate representation by his counsel at the penalty phase of his trial. Here, the question is only whether counsel's deficient performance was prejudicial. There can be little doubt that it was.

Fernando Belmontes, Jr. was convicted of first degree murder and sentenced to death in California state court in 1982. After his conviction and sentence were affirmed by the California courts on direct appeal and in state post-conviction proceedings, Belmontes filed a petition for writ of habeas corpus in the district court, seeking to set aside both his conviction and sentence. In 2000, the district court found that counsel's representation during the penalty phase was deficient, but that his deficient performance did not prejudice Belmontes. In 2001, the court denied the petition in its entirety. Belmontes appealed. In 2003, we affirmed the denial of relief with respect to Belmontes's guilt-phase claims, but reversed the denial of penalty-phase relief on the ground that the jury was improperly instructed as to the mitigating evidence it was required to consider. *Belmontes v. Woodford*, 350 F.3d 861 (9th Cir. 2003) ("*Belmontes I*"). In 2005, the Supreme Court vacated our judgment and remanded for reconsideration in light of *Brown v. Payton*, 544 U.S. 133 (2005). *Brown v. Belmontes*, 544 U.S. 945 (2005). We again granted penalty-phase relief because, unlike in *Payton*, Belmontes's petition was not subject to the strict requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Belmontes v. Brown*, 414 F.3d 1094 (9th Cir. 2005) ("*Belmontes II*"). In 2006, the Supreme Court again granted certiorari and by a five to four vote reversed our decision with respect to instructional error, this time on the merits. *Ayers v. Belmontes*, ___ U.S. ___, 127 S. Ct. 469 (2006). The Court then remanded, leaving us with the task of resolving Belmontes's remaining penalty-phase claims, primarily ineffective assistance of counsel.

Belmontes's remaining claims are as follows: (1) that he received ineffective assistance of counsel during the penalty phase of his trial; (2) that he was deprived of due process when the district court denied his request for an evidentiary hearing on his first claim; and (3) that he was deprived of due process and a fair penalty phase trial, and subjected to cruel and unusual punishment, by (a) the admission of evidence of

his prior acts of misconduct, (b) the trial court's response to questions from the jury about the consequences of their failure to agree on a unanimous verdict with respect to the penalty, and (c) the trial court's pre-judgment of Belmontes's motion to reduce his sentence. Because we conclude that Belmontes's counsel not only provided deficient representation at the penalty phase of his trial but that Belmontes *was* prejudiced by that deficient performance, we reverse and remand for issuance of a writ of habeas corpus and, if the State so elects, a new death penalty proceeding.[1]

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In our two prior opinions in this case, we summarized the facts and history that related to the issues before us. *See Belmontes II*, 414 F.3d at 1102-11; *Belmontes I*, 350 F.3d at 869 78 This is the first time that we have addressed the claim of penalty-phase ineffective assistance of counsel. Thus, we again recite the history and facts of this case, but this time with an emphasis on those facts that are relevant to the ineffective assistance of counsel claim, including facts that were determined during post-conviction proceedings and did not appear in our earlier opinions.

## A.   The Crime, Investigation, and Guilt Phase of Belmontes's trial

On the morning of Sunday, March 15, 1981, nineteen-year-old Steacy McConnell telephoned her parents and told them that she was afraid because several people, including Belmontes's eventual codefendant Domingo Vasquez, had threat-

---

[1]Under California law, a sentencing jury in a death penalty case has only two choices: life without the possibility of parole or death. *See* Cal. Penal Code § 190.2 (West 1978). If, following a reversal of the capital sentence, the State chooses not to institute further proceedings with respect to the death penalty, Belmontes will automatically receive a sentence of life without the possibility of parole.

ened her. When McConnell's parents arrived at her residence in Victor, California several hours later, they found her lying unconscious in a pool of blood. She died shortly thereafter from cerebral hemorrhaging caused by fifteen to twenty blows to her head with an iron bar. Her house was ransacked and her stereo was missing.

On the Tuesday preceding the murder, several people, including Vasquez and another codefendant, Robert "Bobby" Bolanos, partied at McConnell's house. Although Bolanos left the residence early Wednesday morning, the party continued until Friday, when Vasquez stole a quantity of "black beauties"—amphetamine pills—from McConnell. Upon discovering the theft, McConnell threw Vasquez and his friends out of the house. The group subsequently discussed their dislike of McConnell.

The police investigation of the individuals who had been present at the party led the officers to interrogate Vasquez and Bolanos. Bolanos eventually admitted that he had been involved in the events that led to McConnell's death, and identified Vasquez and Belmontes as his coadventurers. Belmontes, who was nineteen at the time, had not been at the party, but had visited Bolanos over the weekend of the murder.

Belmontes, Bolanos, and Vasquez were each charged with first degree murder and special circumstances. However, Bolanos soon arranged a deal with the prosecution in which he agreed to testify against Vasquez and Belmontes in exchange for a guilty plea to second degree burglary and immunity on the murder charge. At Vasquez's preliminary hearing, Bolanos named Belmontes as the main assailant. After the preliminary hearing, the trial judge dismissed the special circumstances charge against Vasquez, who pled guilty to second degree murder. That left Belmontes, who alone proceeded to trial.

Bolanos was the State's principal witness. He testified that on the morning of Sunday, March 15, he and Belmontes drove to Vasquez's residence to hang out. When they arrived, Vasquez was on the phone with McConnell. When Vasquez hung up, he informed them that McConnell would not be home during the latter part of the day. The three were short of cash, and they agreed to burglarize McConnell's residence, steal her stereo, and "clean house." According to Bolanos, as the men departed Vasquez's house through the kitchen, Belmontes grabbed from the counter an iron dumb-bell bar that Vasquez's wife used for rolling tortillas.

Bolanos told the jury that the three men then drove to McConnell's in Bolanos's car and parked a short distance from the house where Belmontes stated that he would approach the house alone, on foot, carrying the metal bar in case he needed to force entry. Bolanos further testified that Belmontes said that he would gather McConnell's valuables and place them near the door to facilitate a quick getaway, and that Bolanos and Vasquez should wait for about five minutes and then bring the car around to McConnell's house.

Bolanos next testified that Belmontes walked to McConnell's residence, and, after about five minutes, Bolanos and Vasquez drove up and backed into McConnell's driveway. Bolanos heard repeated knocking or banging noises coming from within the house. Vasquez walked to the front door to assist Belmontes. Shortly thereafter, Belmontes and Vasquez emerged from the back door of the house carrying stereo components. Belmontes was sprinkled with blood and Vasquez "looked like he had seen a ghost." According to Bolanos, Belmontes stated that he had had to "take out a witness" because McConnell had been home, and explained that when McConnell heard Vasquez and Bolanos drive up, she looked away from him and he seized the opportunity to hit her with the bar.

Bolanos finally testified that, after leaving McConnell's house, the three drove to the nearby city of Galt, where they

intended to fence the stereo. En route, Belmontes threw the bar out of the car window as they crossed a bridge. The trio eventually sold the stereo for $100.

Detective Holman, the lead investigator on the case, testified that Belmontes furnished three tape-recorded statements shortly after his arrest. In the first statement, he denied any involvement in the crime. In the second, he admitted the burglary but denied hitting McConnell. In the third, he admitted hitting McConnell, but insisted that he hit her only once, and then only at Vasquez's direction. He stated that the single blow he delivered caused McConnell to fall down, at which point he dropped the bar and began searching the house for valuables, leaving Vasquez alone with McConnell. Belmontes asserted that he did not pay attention to Vasquez's actions during this period and did not witness the fifteen to twenty fatal blows to the head that McConnell suffered. Holman also testified that a small drop of blood found on the tongue of one of Belmontes's shoes tested as "type O"—McConnell's blood type.

Dr. Maduros, the pathologist who performed the autopsy on McConnell, testified that she died from cerebral hemorrhaging caused by fifteen to twenty blows to the back left portion of her skull. She had a separate contusion on her right temple, which was caused by a single blow of lesser force that did not lacerate the skin. However, he informed the jury that this blow alone would not have caused death and, if it had been the first, it would likely not have caused unconsciousness. Injuries to McConnell's arms, hands, legs, and feet evidenced a struggle.

Belmontes testified in his own defense. He insisted that, while he was searching the back part of the house for something to take, Vasquez struck the fatal blows. Belmontes stated that prior to the murder, he and Bolanos had gone over to Vasquez's house, and that when Vasquez mentioned that McConnell would not be home, they decided to steal her ste-

reo. Although they expected McConnell to be away, the plan was that Belmontes would go to the door in case she turned out to be home; they thought that because of the confrontation between Vasquez and McConnell at her party a few days earlier, she would become angry and suspicious if she saw Vasquez or Bolanos at her door. Although Belmontes had met McConnell a few times in the past, she did not know that he was a friend of Vasquez and Bolanos.

Belmontes stated that it was not he who took the metal bar from Vasquez's house but that while they were all in the car, Vasquez gave it to him to use to break a window, and he then concealed it in his sleeve. Vasquez and Bolanos stayed in the car while Belmontes walked to McConnell's front door. According to Belmontes, he knocked at McConnell's door and, to his surprise, she answered. As soon as he found out that she was home, he abandoned his intent to burglarize her residence. He told her that he had been hitchhiking and had stopped by because it was raining. McConnell invited him in. She noticed a bulge in his sleeve and asked what it was. He showed her the bar and explained that he had it because he was hitchhiking.

Belmontes further testified that five minutes after he entered the house, Bolanos and Vasquez pulled into the driveway. McConnell started walking toward the front door. Belmontes followed behind her and was placing the bar back up his sleeve when Vasquez knocked on the door. Vasquez pushed the door open, saw McConnell, and ordered Belmontes to "hit her." Belmontes followed Vasquez's directive and struck McConnell once on the side of the head with the bar. She fell to the floor. Belmontes dropped the bar, ran to the back bedroom, searched that room and the kitchen, and returned to the living room. Upon returning to the front of the house, he observed Vasquez standing over McConnell and holding the metal bar. He did not see or hear Vasquez hit McConnell. He could not explain the presence of defensive bruises and contusions on McConnell's hands, arms, and feet.

The rest of Belmontes's testimony was, with a few exceptions, consistent with Bolanos's. According to Belmontes, it was Vasquez who handed him the steel bar after they left McConnell's, and it was Vasquez (not Belmontes) who stated that he had had to take out a witness. Otherwise, his testimony was as follows. Belmontes and Vasquez gathered the stereo components and exited from McConnell's back door. They loaded the stereo components into the trunk. Vasquez got in the back seat, Belmontes rode shotgun, and Bolanos drove. Belmontes wiped blood off the bar and set it down on the floorboard. It was not his idea to throw the bar out the window into the river, but Bolanos and Vasquez told him to do so, and he complied. He concluded his testimony by stating they then sold the stereo for $100, divided the money, bought some beer, and drove to the home of an acquaintance.

After three hours of deliberation, the jury convicted Belmontes of first degree murder with special circumstances. It also made special findings that Belmontes was the actual killer, and that he had the specific intent that death occur.

## B. The Penalty Phase

### 1. *Aggravating Evidence*

At the penalty phase, the prosecution introduced minimal aggravating evidence, the sum total of which consumed only 24 pages of the double-spaced transcript.

The detective who oversaw the investigation of the crime authenticated two autopsy photographs depicting McConnell's wounds. This was the only evidence relating to the circumstances of the crime that the State introduced at the penalty phase.

William Cartwright, manager of a motel in Ontario, California, testified to an incident in early 1979 in which an individual named Rudy met Belmontes at a motel and attempted

to sell him a .32 caliber automatic handgun that he had acquired in a burglary. Belmontes reportedly examined the weapon, cocked it, pointed it at Rudy and said, "I've got it now. Why buy it?" Rudy left the premises and Belmontes retained the weapon.

Steven Cartwright (the record does not disclose any relationship with William) testified that he had a conversation with Belmontes in February 1979 in which Belmontes alluded to the fact that some people were upset with him. As Belmontes talked, he indicated that he had a gun in his belt by slapping his side, and he stated that he was not concerned because he had all the protection he needed.

Ron Cutler, a California Youth Authority ("CYA") counselor, testified that he once observed Belmontes swinging a chair as if he were about to hit another ward, but Cutler was able to intervene before a fight ensued. On cross-examination, he admitted that Belmontes was significantly smaller than the other youth.

Barbara Murillo, Belmontes's former girlfriend, testified about a domestic violence incident that occurred when she asked Belmontes to move out of their shared apartment and to give her his keys to the apartment before leaving. Although Belmontes was willing to leave, he was unwilling to give her the keys because his belongings were still in the apartment. When he tried to leave without giving Murillo the keys, she attempted to restrain him by grabbing his jacket, tearing off the buttons in the process. During the ensuing fight, Murillo, who was four months pregnant with Belmontes's second child, grabbed a "file" for protection and attempted to phone the police. Belmontes cut the telephone cord with his knife. He then pushed her, hit her on the head, and tried to choke her. At some point during the altercation, he also caused her to drop their infant daughter. The pair were eventually separated by several friends who were present at the time. A

neighbor summoned the police, who arrived as Belmontes was leaving the premises.

Finally, the prosecution and defense stipulated to the fact that Belmontes entered a plea of no contest in April 1979 to a charge of being an accessory after the fact to voluntary manslaughter. The court refused to allow the prosecutor to introduce evidence indicating that Belmontes had actually murdered the victim, Jerry Howard. Specifically, the court ruled that

> we have the crime of accessory after the fact to voluntary manslaughter to which the defendant has entered a plea of no contest to which thereafter he was found guilty by the Court pursuant to the plea of no contest. That matter has been adjudicated. It is res judicata with reference to any fact that — or conduct that occurred during the course of the voluntary manslaughter. . . . [The] Court will allow the prosecution to present testimony and evidence that [Belmontes] entered a plea of no contest to being accessory after the fact to voluntary manslaughter. The Court will not allow testimony with reference to whether or not the defendant did in fact do the shooting as alleged, the matter having been adjudicated.

Consequently, the jury was never informed of any of the details of Howard's death or of Belmontes's alleged role in it.[2]

---

[2]On this appeal, the State does not challenge the propriety of the trial court's exclusion of this evidence. Rather, it argues that if Belmontes's counsel had attempted to offer expert testimony as to Belmontes's ability to conform his conduct to societal standards in a structured environment, the evidence as to his role in the Howard killing would be admissible by way of cross-examination. *See infra* at section II.B.2.c.

2.  *Mitigating Evidence*

The presentation of mitigating evidence by Belmontes's trial counsel, John Schick, was also limited in scope. This evidence primarily provided the jury with a cursory presentation of some of Belmontes's family history and his conversion to Christianity while incarcerated at a Youth Authority facility, and provided some information regarding his conduct during that incarceration.

Belmontes's maternal grandfather, Michael Salvaggio, testified about his daughter's unhappy marriage to Belmontes's father. Salvaggio stated that his daughter was sixteen when she ran away from home and married Belmontes's father, who was unemployed, refused to support his family, drank to excess, and beat her. He also stated that the Belmontes family did not have a stable place to live for extended periods of time. He lamented the fact that his Italian-American daughter had married a man of Mexican descent. Salvaggio said that he was "very close" with Belmontes until he was about thirteen, but thereafter had little contact with him. Salvaggio did state, however, that when Belmontes was sixteen and his grandmother lay dying in the hospital, he visited her every day. He also attended her funeral. Salvaggio further testified that he believed Belmontes was "a victim of circumstance."

Carol Belmontes confirmed that her marriage to Belmontes's father was unhappy and tumultuous. Fernando Belmontes, Sr., was a violent alcoholic who "wouldn't ever work" and who regularly beat her, breaking her arm on one occasion and stabbing her on another. Belmontes was ten years old when the marriage broke up. Mrs. Belmontes remarried, but her second marriage ended five years later, when Belmontes was about fifteen. From that age on, Belmontes was difficult to control. He had not lived with his mother since he was committed to the CYA two years before McConnell's murder. He had a younger brother and sister, with

whom he was "very close." Mrs. Belmontes's testimony ended with the following exchange:

Q. How would you view your relationship with your son Fern[ando]?

A. My relationship?

Q. Um-hmm (affirmative).

A. Same as it's always been.

Q. What kind of qualities can you recommend to this jury as they consider his fa[te]?

A. I don't believe he should go to the gas chamber.

Q. Just because you're his mother?

A. No. I don't believe he did it.

Q. Are you aware of the facts of this case?

A. (Affirmative nod)

I know my son.

Mr. Schick: I have no more questions.

Robert Martinez, a close friend of Belmontes's since his early teens, testified that he and Belmontes spent a great deal of time together, usually working on Martinez's low-rider car. Belmontes served as best man at Martinez's wedding and was someone he could turn to for advice and support when he argued with his wife. Martinez also testified that he felt Belmontes was not a violent person. However, with defense counsel's consent, this testimony was struck following an objection from the prosecutor, who argued that if the evidence

was admitted, the prosecution should be allowed to impeach Martinez with evidence regarding the Jerry Howard killing.

Belmontes again testified on his own behalf. He recounted that he had a poor relationship with his father, who often came home drunk and hit his mother. He did not like school and stopped attending in the ninth grade (some records indicate it was the tenth grade). He wanted to get a job so that he could help his mother pay the bills. Although he described his youth as "pretty hard," he twice stressed that he did not want to "use it as a crutch."

With respect to his time at the CYA, Belmontes testified that he was in the custody of the Youth Authority from early 1979 until November 1980, four months prior to the crime. While at the CYA, he was employed on the fire crew at the Pine Grove Camp for one year, during which time he worked his way up from last man to number two man, a position of leadership and responsibility. Belmontes also testified that during his incarceration he became involved in the M-2 Christian sponsorship program, a program that matched a local church-going family with a ward. As part of the program, a ward would be permitted to leave the CYA facility to visit with the family at specified times each week. Belmontes admitted that he initially entered the M-2 program in order to spend time outside of the camp, but after his favorable experiences with his M-2 family, the Haros, he gradually became curious about their Christian faith and embraced it.

Belmontes further testified that after he was paroled from the Youth Authority he stayed at a halfway house in Oakland for two weeks, then went to Southern California for a short period, and finally returned to the Lodi area to take a job with the forest service. He testified that he moved to Lodi in part so that he could be close to the Haros. However, outside of the Youth Authority he had trouble maintaining his religious commitment and "started going back to [his] old ways," in part due to "pressure on the streets." At the time of trial, he

had not abandoned his religious beliefs entirely but felt that he was no longer "dedicated one hundred percent" to his religious commitment.

When asked about whether he would be able to contribute to society if sentenced to life in prison rather than death, he stated that he "didn't know." When asked what he would do with the next 50 to 60 years of his life if he were sentenced to life in prison, he said that "it is hard to say. Ain't too many opportunities in there, too many things you can do except try to stay alive. I don't know. Just try to stay alive." He was then asked whether he would be prepared to contribute to society in any way that he could if sentenced to life in prison, to which he responded, "[i]f the opportunity is there, yes."

The Reverend Dale Barrett, chaplain at the Youth Authority's Pine Grove Facility, testified that he knew Belmontes from his participation in the M-2 Christian sponsorship program. Barrett explained that Belmontes was matched with Beverly and Fred Haro and participated in the program for about a year. In addition, Belmontes was baptized during his stay in the CYA. Only a small percentage of program participants who made a serious commitment to Christianity were baptized. Barrett felt that, unlike the many wards who stayed in the program only to get out of camp and elicit favors from the sponsoring families, Belmontes had not "conned" them. When asked about whether he thought Belmontes should be sentenced to death, Barrett testified that, although he personally believed in the death penalty, he did not think Belmontes deserved to die because he thought premeditation was "a debatable point," and thought Belmontes was a "salvageable" person with "a lot of extenuating circumstances in his life." Barrett was of the view that Belmontes's involvement in "some of the situations in which he found himself"—e.g. McConnell's murder—was attributable to "the enormity of the peer pressure and the kind of sociological circumstances that were part of his life." When asked whether he thought

that Belmontes would be able to contribute something if sentenced to life in prison without parole, he stated that he would

> like to think so, based upon the tremendous success that is being realized by a number of people being involved in prison ministries. I'd like to feel that we are having a great deal of success. Perhaps someone could say with regard to Fern[ando], "Do you feel you're a failure?" Obviously, this is not the result we would like to see. About 80 percent of our young men in the program do well, stay out of trouble. The rate of recidivism has been greatly affected by the M-2 programming. I like to think we make a contribution to their lives and sense of well-being and self-image, and prison ministries can continue to contribute that to the lives of young men who have failed.

When asked whether he would be involved in prison ministry with Belmontes if he were granted life in prison, Barrett said that he would, "if the issue of proximity would be resolvable. If not, I would be anxious to direct others to him geographically on the basis of my associations."

Don Miller, assistant chaplain at the Youth Authority's Preston Facility and the Northern California Director of the M-2 program, testified that he helped place Belmontes in a halfway house in Oakland upon his release from the CYA. Miller stated that, at the time, he felt "a little bit doubtful" about whether Belmontes should have been released from the facility because, in Miller's view, he needed a little bit more instruction regarding "[a]ccepting authority and being able to adjust to the community outside." Miller testified that, after being released from the CYA, Belmontes stayed at the halfway house for only two weeks before moving to the Lodi area to take a job with the forest service. During those two weeks, however, Belmontes returned to Preston on a few occasions to speak to wards about what life was like "on the outside." Miller described Belmontes, and his message, as well-

received by the CYA wards, and he believed that if Belmontes were committed to prison for life, he would be good at counseling other prisoners not to make the same mistakes that he had. Miller was enthusiastic about working with Belmontes in this capacity and stated that Belmontes "definitely would be used in the prison system for this kind of activity" because he related well to other prisoners, especially those who shared his ethnic background.

Darlene Martinez, a born-again Christian and the wife of Belmontes's friend Robert Martinez, testified that she had known Belmontes for six or seven years and considered him a close friend. Darlene recounted that when Belmontes visited them after his release from the Youth Authority, he told her that he, too, was a born-again Christian. He also mentioned his disputatious relationship with his girlfriend, Murillo, and stated that he was planning to move in with her. During the conversation, Belmontes expressed concern that Murillo was not a Christian, and he worried that he would be unable to maintain his Christian faith on his own.

Beverly and Fred Haro, Belmontes's M-2 sponsors and members of Reverend Barrett's church, testified that Belmontes spent Wednesday evenings and weekends with them for almost a year. They felt that they had a good relationship with Belmontes, who attended church with them. They treated him like their own son, and he opened up to them and was a good influence on their own teenage son. They saw him several times after his release from the CYA. Fred Haro stated that he had "compassion as a son" for Belmontes and that Belmontes had been genuine in his commitment to the M-2 program and his affection for his sponsors. He also stated that, although he was "strongly for the death penalty," he believed Belmontes was innocent and that, because he was innocent, he did not deserve to die.

### 3. *Closing Arguments*

During closing arguments, the prosecutor described the evidence introduced in aggravation—that Belmontes had once

swung a chair at another CYA ward, had been involved in the domestic violence incident with Murillo, had taken a gun from a person who offered to sell it to him, had once told someone that he was carrying a gun, had been convicted of being an accessory after the fact to voluntary manslaughter, and had murdered McConnell in a calculated manner. Turning to the mitigating evidence, the prosecutor stated that Belmontes's age was a factor that "goes both ways," that his religious beliefs did not really extenuate the gravity of the crime, and that "the evidence upon which [Belmontes's] religious experience rests is somewhat shaky." Moreover, he noted that Fred Haro's and Reverend Barrett's favorable assessments of Belmontes's character and capacity to do well in prison were not entirely credible because neither witness thought Belmontes could commit the crime the jury "knew" he committed, and thus that these witnesses did not truly know Belmontes. The prosecutor further argued that there was no lingering doubt regarding Belmontes's guilt, and stated that Belmontes had shown no remorse regarding McConnell's murder. He then stated that the evidence in mitigation and in aggravation were a "wash" or a "draw" until one considered the circumstances of the crime; taking that factor into account, the appropriate penalty was, in the view of the prosecutor, death.

After the prosecutor's closing statement, the court permitted Belmontes to address the jury personally. He began by stating that, although his childhood was not "a very good childhood," he did not want to use it as a crutch. He further stated that, after spending time with the Haros and seeing how they lived,

> I wanted to be like that, I wanted to change my life and see how it was. I tried. Like I said, it's a lot easier to do while you're in jail because you have a lot less pressures. When I did get out . . . I guess I couldn't deal with the pressures out there. Like I say, it's a lot different.

Turning to his religious beliefs, he stated that he was

> not coming here and saying right now that I'm a full-fledged Christian or a born-again. I was born again and I still feel the same way, but I'm not using that as a crutch, also. But it is something that I tried and I really believe in.

> As for the verdict right here that you're going to deliberate on right now, I myself would like to keep my life and not really lose it in the gas chamber.

> [The prosecutor] has stated that he does not feel I have remorse. [He] does not know. . . . [He] was not there that day.

With respect to the crime, Belmontes stated that the prosecutor

> has told you that I'm the actual killer. He does not know. He wasn't there. He's only going on what he thinks happened that day . . .

> He says I can't put my feet in [McConnell's] shoes. It's true, I can't. I didn't go through it. I wasn't the one who was actually killed. But he hasn't had to sit and think about actually getting put in the gas chamber or life without imprisonment [sic]. I'm not saying I didn't do it or wasn't guilty. Like I said, I was involved to a certain extent. I have to pay for what's happening — what happened, and I can deal with that. You know, there's only two choices right now, life without the possibility or the death penalty. Both of them ain't really — isn't really any good. There's always the possibility that while you are living with life without the possibility that you will die in there. You can't really say. Things happen.

>     But there is an opportunity to achieve goals and
> try to better yourself. . . . I myself would really like
> to have my life and try to improve myself.
>
>     [The prosecutor] has said that I stood up there and
> hit [McConnell] once and then hit her again. . . .
> Again, he wasn't there. He doesn't know that I actu-
> ally hit her the 20 times like he says I was. This is
> his belief. . . . He doesn't know me. . . . I just ask
> that you think about this a lot and give it a lot of
> thought as to the verdict on this penalty phase.
> That's it. Thank you.

After Belmontes made this statement, his counsel, John
Schick, argued first that, notwithstanding the jury's earlier
verdict, there was no evidence that the murder was premedi-
tated. Next, he stated that, although he did not want to suggest
that "the presence of religion in itself is a totally mitigating
factor[,]" religion plays a "very, very vital function . . . in
anybody's life." With respect to Belmontes's childhood,
Schick said only that

>     while Mr. Belmontes has told you he is not going to
> use a crutch for [sic] what happened in the first part
> of his life, I'd like to suggest to you until he got to
> know Beverly and Fred Haro, . . . he didn't really
> know, he didn't really have the sense of values that
> a human being, a young man about to embark upon
> adulthood should have. And that is what his experi-
> ence with Reverend Barrett and Beverly and Fred
> Haro in the time he was there in their home while he
> was in the California Youth Authority meant.

He went on to state that

>     what I hope the evidence suggests to you is Fer-
> nando Belmontes cannot make it on the outside. I
> think it is pretty clear from the experience that he

had inside, the kind of development he undertook, the kind of experiences he had with the Haros as compared with his being placed out on his own. . . . Again, we are not saying this is an excuse, but you have to understand the problems that people have in dealing with their lives.

Although Schick argued that Belmontes could not make it "on the outside," he did not argue that he *could* or *would* make it "on the inside." Schick then proceeded to the dominant theme of his closing argument:

Punishment is one of two choices. Consider, if you will, a young man who is 21 years old, Mr. Belmontes. . . . [L]ets assume he has 50 to 55 years left of his life. . . . [A] sentence of life without possibility of parole means that for everyday, 24 hours a day, seven days a week, 365 days a year he will be without that most precious commodity that we have, freedom. You will punish him far greater and for a far more significant impact upon his life by sending him to prison for the rest of his life.

You've probably heard about people in a position of being on death row asking for execution. You all remember the Gary Gillmore charade a few years ago, prisoner in Utah who wanted to be killed. There are some people who feel that way because they can't deal with it. It is easier to die than face that possibility. It is easier to die than face the possibility of never, ever having your freedom. If you want to impose, and I think you need to impose punishment. This young man needs to be punished. I'm not going to tell you that isn't a truth. But if you want to impose a punishment upon him that has meaning, that has teeth to it, send him to prison for the rest of his life, however long that may be. . . . I'm only trying to suggest something because it's difficult for

any of us to conceive of such a harsh penalty as life in prison without ever being released.

And it is harsh. You remember during voir dire you were asked to compare these two penalties. I think it was constantly referred to as life without the possibility as being the more lenient of the two penalties. Well, to the extent that [the prosecutor] believes Mr. Belmontes should die, I suppose it is lenient.

Schick also asked the jury to think about why, as a society,

we decide to kill people. We justify it in war. Certainly nobody has quarrels with that. . . .

But how do we feel? How do we justify it? How do we justify taking another of God's creatures by killing them? We dehumanize the other people. Look at the Vietnamese war. We weren't fighting the Vietnamese. We were fighting Gooks. Look at the Japanese war, we called them Wops and Japs. World War I we fought the Huns. We made it possible in our mind to dehumanize these people so we could go out and kill them and not feel guilty about it.

That is exactly what we must do and what you are being asked to do in evaluating the life of Fernando Belmontes. You are being asked to look at him and say to yourself, this man is not a human being. . . . You must be able to do that, to go through that process of dehumanizing him in order to kill him. And ladies in gentleman, that is exactly what the evidence I produced at this penalty trial has shown. . . . [H]e has not been proven to be dehuman [sic].

At no point did Schick mention any of the traumatic experiences that Belmontes underwent during his childhood or his

youth.[3] As a result, he failed to explain to the jury how those experiences affected Belmontes; what the relationship was between the tragic events and Belmontes's subsequent criminal conduct; and why the jury should consider those circumstances in determining whether Belmontes was an individual who should be put to death or whose life should be spared.

4.   *The Jury's Penalty Deliberations and Verdict*

The jury deliberated for a day and a half before reaching a verdict. On the first day, after several hours of deliberations, the jury sent the judge a note asking, "What happens if we cannot reach a verdict?" and "Can the majority rule on life imprisonment?" The jury was brought back into the courtroom, and the judge reread a portion of the jury instructions, emphasizing that "all 12 jurors must agree, if you can." Thereafter, the following exchange occurred:

> JUROR HAILSTONE:   If we can't, Judge, what happens?
>
> THE COURT:         I can't tell you that.

---

[3]The dissent takes issue with this statement and notes that we "fail[ ] to give proper emphasis to the fact that several witnesses testified about those issues." Dis. Op. at 6828. It is not we who failed to emphasize this testimony; it is Schick. In fact, he never even mentioned it in his closing argument. Schick wasted his only opportunity to remind the jury of the insubstantial and inadequate mitigating testimony that he did manage to present and to explain to them why that evidence should persuade them to spare Belmontes's life. Our cases make clear that in addition to presenting witnesses to testify about mitigating circumstances, defense counsel must also explain the significance of the mitigating testimony in his closing statement. *See Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001) (en banc) (finding deficient performance in part because counsel "failed to explain to the jury the significance of the mitigating evidence . . . during his closing argument"). For further discussion of this issue, see *supra* at section II.B.2.a.

| | |
|---|---|
| JUROR WILSON: | That is what we wanted to know. |
| THE COURT: | Okay. I know what will happen, but I can't tell you what will happen. |
| MR. SCHICK: | Maybe we should inquire whether the jury could reach a verdict. |
| THE COURT: | Do you think, Mr. Norton, you will be able to make a decision in this matter? |
| JUROR HAILSTONE: | Not the way it is going. |
| JUROR NORTON: | That is tough, yes. |
| THE COURT: | Do you think if I allow you to continue to discuss the matter and for you to go over the instructions again with one another, that the possibility of making a decision is there? |
| JUROR NORTON: | I believe there is a possibility. |

After this exchange, the jury continued its deliberations. A little more than a day later, the jury reached a verdict and sentenced Belmontes to death. After the verdict, the judge sent a letter to the jurors thanking them for their service and telling them that their "decision is acceptable and shall be followed." Subsequently, he imposed the judgment and sentence of death.

## C.   State Appeals and Federal Habeas Review

The California Supreme Court affirmed Belmontes's conviction and sentence in 1988, *People v. Belmontes*, 755 P.2d 310 (Cal. 1988), and the U.S. Supreme Court denied certiorari in 1989. *Belmontes v. California*, 488 U.S. 1034 (1989). Belmontes then filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of California, which the court held in abeyance while Belmontes exhausted additional claims before the California Supreme Court.

In 1993, after the California Supreme Court summarily dismissed Belmontes's petition, denying him an evidentiary hearing on any of his claims, proceedings on the federal writ resumed before a magistrate judge. In 1996, the magistrate judge denied Belmontes's request for an evidentiary hearing on various claims, but granted his motion to expand the record to include depositions, declarations, and other documents submitted by the parties. The magistrate judge and the district judge thereafter considered all of this material when making their rulings.

The deposition testimony, declarations, and other evidence submitted by the parties revealed critical omissions in Schick's mitigation investigation and in his preparation for the penalty phase. These submissions also demonstrated that there was a substantial amount of additional mitigating evidence that could and should have been investigated, developed, and presented at the penalty phase of Belmontes's trial. Finally, the evidence and the record also revealed that counsel failed to properly prepare the witnesses for the penalty phase hearing and failed to explain to the jury the relevance of the meager evidence he did present.

At the habeas proceeding, Belmontes presented the testimony of two experts on ineffective assistance of counsel who opined that Schick had not prepared for the penalty phase in

a reasonably competent manner. The first expert, James Larsen, is the former deputy public defender who represented Belmontes's codefendant, Domingo Vasquez, for whom he negotiated a plea to second degree murder. At the time of Belmontes's trial in 1982, Larsen was one of the most experienced criminal defense attorneys in San Joaquin County, the county in which Belmontes was tried. Belmontes's second expert, Ephraim Margolin, is the former president of the National Association of Criminal Defense Lawyers, was the founding president of California Attorneys for Criminal Justice, and was a lecturer at Boalt Hall School of Law, Santa Clara Law School, and Hastings Law School for many years. At the time of his deposition testimony, Margolin had tried numerous murder cases and had represented scores of criminal defendants on appeal in jurisdictions across the country. He had also served as an expert with respect to the competency of trial counsel in numerous capital habeas proceedings.

In his deposition, Larsen testified that a reasonably competent trial attorney representing a capital defendant in San Joaquin County in 1982 would have known that he had a duty to conduct a thorough investigation of all potentially mitigating factors, including the defendant's background and mental state. When asked about the basis of that opinion, Larsen stated that his opinion was based upon the California and U.S. Supreme Court cases establishing the standards for competent representation in capital cases, as well as the American Bar Association standards regarding the duty of defense counsel, that were in existence prior to 1982.

Margolin likewise testified that any reasonably competent attorney representing a capital defendant in California in 1982 would have known that investigating both the positive and negative aspects of a defendant's mental state was essential. Such a lawyer would likewise have known that he had a duty to obtain information about the defendant's childhood, personality, history of medical and mental health problems, and to gather all school and medical records. When put on notice

that the defendant might be a drug user, such a lawyer would also have known that he had a duty to investigate the extent of the defendant's drug use and its effect on his behavior.

With respect to whether Schick's mitigation investigation had been performed in a constitutionally adequate manner, Larsen testified that, in his view, Schick had "not act[ed] as a reasonably competent attorney" in conducting his penalty-phase investigation because he failed to investigate potential mitigating evidence related to various mitigating factors set forth in California's death penalty statute, most notably evidence related to Belmontes's mental state. Specifically, Larsen noted that there was information in the pre-trial report prepared by psychiatrist Dr. Cavanaugh, the reports prepared by Schick's investigators, and Belmontes's CYA file that would have led a reasonably competent attorney to conduct further investigation with respect to Belmontes's background and mental state.

Margolin likewise testified that, in his view, Schick did not act in a competent manner in preparing for the penalty phase of Belmontes's trial. Specifically, he testified that Schick performed incompetently in

> fail[ing] to investigate leads which should have been obvious to him.
>
> Where he did attempt to present evidence, he presented it in a way which did not link it to anything that would have been meaningful to the jury. He did not have a coherent notion of why he [was] presenting what he [presented]. . . .
>
> [H]e did not prepare the witnesses for the testimony which he was eliciting, and I think that he . . . infected the whole [penalty] proceeding . . . with incompetency.

## 1. *Schick's Mitigation Investigation and Penalty-Phase Preparations*

The evidence at the habeas hearing revealed that a month or two before trial, Schick had an investigator, Jim Berwanger, contact several potential penalty-phase witnesses, including a few of Belmontes's friends and family members, the Haros, and a few CYA staff members. After Berwanger met with these potential witnesses, he prepared three brief reports. Schick obtained Belmontes's CYA file and met once with Assistant Chaplain Don Miller. Berwanger's reports and Belmontes's CYA file constitute the sum total of the reports that were prepared and the documents that were gathered in preparation for the penalty phase. Based on this investigation, Schick decided that his goals with respect to the penalty phase would be to (1) humanize Belmontes, (2) show that he would not be a difficult prisoner and could form good relationships with people, (3) provide the jury with information about his background, and (4) raise lingering doubt about whether Belmontes was the actual killer.

Although Schick hired a psychiatrist, Dr. Cavanaugh, to evaluate Belmontes's mental state for purposes of the guilt phase, he did not ask Cavanaugh to comment on any issues relevant to the penalty phase, and did not consult any psychologists or psychiatrists with respect to any possible mental defect, impairment, or condition that might be relevant to sentencing as opposed to guilt. Specifically, he did not ask any expert to evaluate the effect on Belmontes of the mitigating evidence regarding his troubled childhood or his mental condition. Schick repeatedly testified that he had no strategic reason for failing to consult with Dr. Cavanaugh or any other psychiatrist or psychologist about the import of such mitigating evidence or its relationship to Belmontes's subsequent behavior. Indeed, even when the State's attorney asked Schick questions designed to encourage him to state that he had a tactical reason for this failure, Schick testified that his decision not to conduct such an investigation was not motivated by

fear of opening the door to damaging rebuttal evidence or any other rationale. Schick gave the following account of his mental processes regarding his failure to conduct an investigation or to present such evidence:

> I can't remember going through a conscious process and saying, "Should I develop [mental state mitigation evidence]?" And, "Therefore for the such-and-such tactical reason I'm not going to do it." It just wasn't something I was focused on. . . . I can't recall going through the process of saying to myself, "Should I put on a psychiatrist at this stage?"

> And I can't tell you as I sit here today that there was some tactical decision. . . .

> I can't recall going through any processes like that. We had interviewed and focused our penalty investigation on personal background witnesses that were called and made reference to, and that's where I put my emphasis in the penalty presentation.

> What I'm trying to say is that I don't think I cognitively went through and rejected it for any reason.

In addition to failing to consult a psychologist or psychiatrist, Schick failed to pursue a host of leads, many of which would have led to the discovery of additional mitigating evidence and would have humanized Belmontes.

Although Schick was aware, through Belmontes's CYA file and other sources, that Belmontes had suffered from rheumatic fever and other illnesses as an adolescent, and knew that these illnesses had been markedly debilitating and that Belmontes had been repeatedly hospitalized as a result, Schick never requested or obtained Belmontes's medical or hospital records.

Schick also knew that Belmontes had a history of serious drug abuse, yet he did not investigate whether mitigating evidence related to Belmontes's drug use should be presented at the penalty phase.

Belmontes's CYA file also put Schick on notice that Belmontes had dropped out of school in the tenth grade and suggested that he had experienced some difficulties there, yet Schick did not obtain any of Belmontes's school records, nor did he contact any of Belmontes's former teachers.

Yet another document in Belmontes's CYA file noted the fact that Belmontes had been involved "in the Cadets, scouts and little league and also involved in school organized groups and athletics." Schick did not investigate Belmontes's involvement in any of these activities, nor did he obtain or present to the jury any information about any other aspects of Belmontes's childhood that might further humanize him or show that he possessed a number of positive attributes.

Belmontes's CYA file also made clear that Dr. Alayne Yates had performed psychological testing on Belmontes during his time in the Youth Authority, the results of which were easily obtainable. Another document in the file suggested that Belmontes might be suffering from depression. Despite his awareness of the psychological testing and the possibility that Belmontes suffered from depression, Schick did not obtain a copy of the results of the CYA psychological testing, did not discuss Dr. Yates's evaluation of Belmontes with her or with any other psychiatrist or psychologist, and, as noted above, did not seek an independent evaluation of Belmontes's mental health or personality traits for purposes of the penalty phase. As Schick testified, he simply did not think about exploring these matters in connection with his penalty phase defense.

With respect to Belmontes's temperament and adjustment to the CYA, the file contained numerous references to the fact that Belmontes possessed positive qualities. In one report, for

example, a CYA staff member described Belmontes as someone who "relates to all ethnic groups," is non-delinquent, and is passive rather than aggressive, exploitive, or assaultive. In another, a CYA staff person noted that, even after being pressured by other Chicano wards to retaliate against a ward who had stolen his personal belongings, Belmontes refused to engage in violence and instead asked CYA officials to transfer him to another facility where he would not face such pressures. Notwithstanding these leads, Schick did not seek to obtain any additional information about the incidents of positive conduct described above, nor did he discuss with any psychologist or psychiatrist or other expert Belmontes's prospects for positive institutional adjustment.

In addition to failing to investigate numerous leads, Schick did little to prepare the witnesses he called to testify. With respect to what had been done in order to prepare Belmontes to make a statement to the jury at the close of the penalty phase, for example, Schick testified that he and Belmontes "probably talked about it a little bit. . . . I'm sure he talked a little bit about what he was going to say, and I may have offered advice to him." If he did offer Belmontes advice, it was not very good advice. In Belmontes's penalty phase testimony, he second-guessed the jury's verdict, he showed little remorse, he could not articulate any concrete way in which he would contribute to society if he were sentenced to life in prison, and he did not explain any of the mitigating evidence or offer the jury any reasons why they should spare his life. All in all, the testimony makes plain that Schick failed to adequately and effectively prepare Belmontes for this crucial portion of the trial.

2.   *Additional Mitigating Evidence That Should Have Been Presented to the Jury*

Belmontes's habeas counsel's investigation revealed that there was a large quantity of mitigating evidence related to Belmontes's background and mental state that was never

uncovered or presented to the jury on account of Schick's fail-
ure to investigate, to follow up on various leads, and to have
a psychologist or psychiatrist evaluate Belmontes for pur-
poses of the penalty phase.

With respect to Belmontes's childhood and adolescence,
habeas counsel's investigation revealed that, in addition to
growing up in a poverty-stricken family in which his father,
a profound alcoholic, beat his mother severely and regularly,
Belmontes dealt with a host of other traumas. When he was
five years old, for example, his 10-month-old sister died of a
brain tumor. After her death, Belmontes exhibited symptoms
of depression and repeatedly visited the cemetery where she
had been buried. In addition to dealing with his father's alco-
holism, Belmontes also suffered as a result of his maternal
grandmother's alcoholism and prescription drug addiction,
which, in combination with her manipulative and controlling
behavior, caused constant strife within both his immediate
and extended family.

In spite of the adversity he experienced, Belmontes was a
kind, responsible and likeable child with a very pleasant
demeanor. He was a loving and protective older brother to his
two younger siblings, and was kind and respectful toward his
maternal grandparents notwithstanding the fact that they dis-
approved of him on account of his mixed racial background.
He participated in Little League, the Navy Cadets, team
sports, and had a paper route. In his early years, he kept up
in school, made friends easily, and got along with his teach-
ers.

At age 14, however, Belmontes was beset by rheumatic
fever, a condition for which he was repeatedly hospitalized.
The disease was significantly debilitating and required him to
stop attending school and to terminate his involvement in
sports and other social activities. As a result, he was isolated
from his peers and unable to pursue the means through which
he had formerly escaped his traumatic home life. He was also

repeatedly told that, as a result of this condition, he would likely not live past 21 years of age.[4] He became depressed, withdrawn, and lost some of the positive personality traits that seemed to be developing during his early years.

Shortly thereafter, his mother and stepfather divorced. As a result, the family was forced to move into a cheap motel in which Belmontes and four family members lived in "a really small, one-room shack." During this time, their lives were disrupted and unstable. His mother's behavior became erratic. She engaged in casual sexual relations with a number of men, and frequently brought the men back to the motel room in which the family lived.

By the time he was a teen, Belmontes had started using drugs on a regular basis. Around the time of McConnell's murder, he was regularly using marijuana, heroin, LSD, and PCP.[5]

---

[4]The dissent argues that Belmontes's illness was not severe. Dis. Op. at 6829. Regardless of whether or not the disease was actually life-threatening, Belmontes's doctors and family behaved as though it were. The social isolation and physical limitations that they imposed on Belmontes, whether or not they were necessary, caused him to suffer significant negative psychological effects. Additionally, Belmontes's belief that he would die young had a profound psychological effect on him, regardless of whether it was medically accurate. The dissent quotes Dr. Yates's testimony that although Belmontes's mother expected Belmontes to die young, Belmontes never believed that he would. Dis. Op. at 6836. However, according to Barbara Murillo, Belmontes's girlfriend and the mother of his children, Belmontes did believe that he would die by the age of 21, causing him to take risks that he would not have taken if he believed that he had a future. Murillo even testified that when she yelled at Belmontes, he would reply, "You won't have to put up with me because I won't be around long."

[5]The dissent's claim that Barbara Murillo testified that Belmontes did not do drugs because it was bad for his illness is puzzling. Dis. Op at 6836 n.20. According to her declaration, when they first started dating, Belmontes did not do drugs or alcohol *when they went out*. Murillo also stated that Belmontes's mother did not approve of his drug use because *she believed* it was bad for his illness. Moreover, Murillo's declaration contains multiple references to Belmontes's drug use, including his use of heroin.

In addition to discovering the evidence described above, habeas counsel's investigation made plain that Schick should have utilized the testimony of a psychologist or psychiatrist to explain to the jury effectively the impact on his conduct and on his mental health of the multitude of traumas Belmontes experienced as a child and adolescent. Specifically, such an expert could have explained to the jury the psychological impact on Belmontes of his father's severe alcoholism; of witnessing severe domestic violence between his parents; of his family's poverty; of observing his mother's profligate sexual activity; of being severely ill during a critical stage in his social development and his removal from the normal experiences of teenage life, including social interaction with his peers; of his symptoms of depression and the repeated predictions that he would die before he reached adulthood; and finally, of his history of substance abuse. Such an expert also could have explained the extent to which these problems caused or contributed to Belmontes's general behavior and to his involvement in McConnell's murder.

The deposition testimony of Dr. James Missett, which Belmontes submitted to the district court, reveals the extent to which such an expert could have explained the significance of the difficulties that Belmontes experienced, in addition to explaining the significance of the positive aspects of his early development. Specifically, Dr. Missett testified that, prior to the onset of rheumatic fever, Belmontes was functioning in an exemplary manner vis-a-vis children who faced similar privation and trauma during their formative years, a fact that suggests Belmontes possesses positive and conforming core personality traits. However, the combination of the traumas he experienced early on in life and his struggle with rheumatic fever caused him to "los[e] ground in comparison with his peers [both] academically [and] socially" and "intensified [his] sense of himself as defective, something from which he never recovered." According to Dr. Missett, this in turn led to Belmontes's substance abuse problems and his eventual involvement in criminal activity. With respect to the evidence

regarding Belmontes's background that was offered at the penalty phase, Dr. Missett stated that

> the critical thing to me . . . was that there was no reference whatsoever in the penalty phase testimony to the linkage that exists between these various factors[,] . . . to the way in which the behavior at one point in time could be related to the experience that Mr. Belmontes had earlier in life, or to the way that the various biological, social, and environmental, educational, and other factors interrelated in Mr. Belmontes'[s] life and could be focused as of the time either of the killing of Ms. McConnell or at the time of his trial and sentencing.

In other words, conspicuously missing from the penalty phase of Belmontes's trial was the testimony of an expert who could make connections between the various themes in the mitigation case and explain to the jury how they could have contributed to Belmontes's involvement in criminal activity.

With respect to Belmontes's experience as a ward at the CYA, habeas counsel uncovered and presented to the district court considerable additional evidence that could have been presented to the jury. As noted above, there were many references to Belmontes's positive conduct in the CYA contained in his file, including his refusal to engage in gang violence. Other documents in the file stated that Belmontes relates well to others, is passive, follows directions, and likes working with young people. Dr. Yates could have testified that she diagnosed him as a conformist, not a manipulator. Although there were also negative aspects to Belmontes's time in the CYA that were noted in the file—namely that Belmontes struggled to adjust when transferred from one institution to another, and that he had, at one point, been involved in the formation of a Chicano clique—the file revealed that his conduct was, on the whole, quite positive.

On an entirely separate point, Schick could have obtained
evidence from Dr. Yates regarding Belmontes's prospects for
positive institutional adjustment. Similarly, he could have
obtained evidence in that regard from an expert witness such
as Gerald Enomoto, the former Director of the California
Department of Corrections and current United States Marshal
for the Eastern District of California. Enomoto could have tes-
tified that Belmontes adjusted well to the structured environ-
ment of the CYA and was likely to be able to conform his
conduct to societal norms if confined in a state prison.
Although the State focused on several negative reports in Bel-
montes's CYA file, Enomoto told the district court that the
reports in the file showed a clear trend of improvement, with
trouble at the beginning but very positive conduct once Bel-
montes had the opportunity to acclimate to the facility. Eno-
moto found the fact that Belmontes had refused to engage in
gang violence to be extremely significant and very positive.[6]

*      *      *

The parties filed cross motions for summary judgment. In
2000, after several years of inaction, the district judge with-
drew his referral of the matter from the magistrate judge,
heard oral argument on the ineffective assistance of counsel
claim and subsequently ruled that counsel had been deficient
but that Belmontes did not suffer prejudice as a result. The
district judge's decision was based on the written evidence
submitted by the parties, in accordance with the magistrate
judge's previous ruling denying Belmontes's request for an
evidentiary hearing with live witnesses. In so ruling, the court
noted that "[t]he record here shows that trial counsel pursued
no investigation whatsoever into Belmontes' mental state for
the penalty phase. Schick acknowledged that after consulting
Dr. Cavanaugh on competency, insanity, and diminished
capacity, he had no further contact with Dr. Cavanaugh, or

---

[6]Whether the evidence regarding institutional adjustment should have
been adduced is a matter we discuss separately. *See* section II.B.2.c.

with any other psychiatrist in relation to the penalty phase." On that basis, the court held that "[c]ounsel's failure to investigate mental state evidence for presentation at the penalty phase, even where such evidence is unhelpful at the guilt phase, is not reasonable under Ninth Circuit precedent."

With respect to prejudice, however, the district court held that "Schick introduced testimony as to most of the factual matters" that Belmontes argues should have been introduced, and that Belmontes "provides no reason to believe that the jury needed professional help, *beyond defense counsel's argument*, to understand evidence of petitioner's difficult childhood or prospects for institutional adjustment."[7] (emphasis added). The court then referred Belmontes's six remaining claims, which had not yet been briefed, to the magistrate judge. In January of 2001, the magistrate judge recommended denying relief with respect to the outstanding claims, and in May 2001, the district court adopted the magistrate's findings and recommendations, denied the petition, and entered judgment against Belmontes.

Belmontes appealed. The subsequent history of this case is set forth above. We must now resolve Belmontes's ineffective assistance of counsel claim, and a few related claims that we have not previously resolved.

## II. DISCUSSION

## A. Standard of Review

Belmontes's federal habeas petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and thus, pre-AEDPA standards

---

[7]As noted above contrary to the district court's statement, defense counsel, in his closing argument made no mention of the pertinent evidence and did not attempt to explain the relevance of such evidence to Belmontes's personality and future conduct.

apply to his claims. *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003). This court reviews a district court's decision to deny habeas relief *de novo*. *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006). "Under pre-AEDPA law, we consider a claim alleging ineffective assistance of counsel as a mixed question of law and fact that we review *de novo*." *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005) (en banc) (citing *Rios v. Rocha*, 299 F.3d 796, 799 n.4 (9th Cir. 2002)). "We review for clear error, however, the district court's findings of fact." *Frierson v. Woodford,* 463 F.3d 982, 988 (9th Cir. 2006). Finally, "[b]ecause this is a pre-AEDPA case, we do not review the state court's legal conclusions to determine whether they are 'objectively unreasonable;' rather, we 'simply resolve the legal issue on the merits, under the ordinary rules.' " *Summerlin,* 427 F.3d at 628 (quoting *Belmontes II*, 414 F.3d at 1101, *rev'd on other grounds*, *Ayers v. Belmontes,* ___ U.S. ___, 127 S.Ct. 469).

## B.   Penalty Phase Ineffective Assistance of Counsel

### 1.   *Procedural Default*

**[1]** The State argues that Belmontes's ineffective assistance of counsel claim is procedurally defaulted because Belmontes "never presented or developed the factual bases of . . . [this] claim[ ] to the state courts" and because the habeas petition in which he raised this claim before the California courts was untimely. These arguments fail for several reasons. First, Belmontes did present the factual basis for his federal claim to the California courts. In rejecting this argument, the district court correctly observed that the State overlooks critical passages from Belmontes's filings before the California courts. Specifically, the district court noted that

> [i]n support of the merits of his ineffective assistance of counsel claim, [Belmontes's] verified reply [filed with the California Supreme Court] states that "Trial counsel acknowledges that he limited his mental

state investigation to Dr. Cavanaugh's interview, did not conduct any comprehensive background investigation regarding petitioner's physical and mental conditions during his upbringing, and did not follow up the unresolved issues emanating from Dr. Cavanaugh's examination with psychological testing or any other means." Petitioner was unable to further describe this claim in state court because the California Supreme Court denied his requests for funds to conduct follow-up investigations and examinations.

Thus, petitioner's state court claim referred to evidence and potential evidence that now provides the basis for his federal court claim.

**[2]** Second, because the California Supreme Court considered the merits of Belmontes's claims, rejecting them "on the merits as well as on procedural grounds," we may reach the merits as well. In *Harris v. Reed*, 489 U.S. 255 (1989), the Supreme Court held that

procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default. . . . [P]rocedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar.

*Id.* at 262-63. Thus, where, as here, the state court did not "clearly and expressly" rely solely upon procedural default in rejecting a petitioner's claim, this court may address the merits of that claim.

Finally, even if the California Supreme Court had clearly relied upon a rule of procedural default in rejecting Belmontes's ineffective assistance of counsel claim—namely

California's rule regarding untimely habeas petitions—we would nonetheless reach the merits of that claim. We did not recognize California's procedural default rules regarding untimeliness as independent and adequate state grounds for rejecting a petitioner's habeas claim until 1993, if not later, *see Karis v. Calderon,* 283 F.3d 1117, 1132 n.8 (9th Cir. 2002); *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996), well after the California Supreme Court rejected Belmontes's claim. Accordingly, we reject the State's procedural default argument and proceed to the merits of Belmontes's ineffective assistance of counsel claim.

## 2. *Ineffective Assistance*[8]

"The Sixth Amendment right to counsel in a criminal trial includes 'the right to the effective assistance of counsel.' " *Summerlin,* 427 F.3d at 629 (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970)). "This right extends to 'all critical stages of the criminal process,' including capital sentencing." *Id.* (citations omitted).

---

[8]Belmontes argues that his due process rights were violated when the magistrate judge denied his motion for an evidentiary hearing on this claim. We reject this argument for two reasons. First, Belmontes did not timely object to the denial of his motion for an evidentiary hearing with oral testimony. Indeed, he waited more than four years after the magistrate judge's ruling to raise such an objection with the district judge and did so only after the judge had rejected his claim on the merits on the basis of a fully developed record. Second, and more important, under 28 U.S.C. § 2246, "[o]n application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit." Although Belmontes was not afforded the opportunity to submit his evidence in support of his ineffective assistance of counsel claim through oral testimony, he was able to expand the record, *see* Rules Governing § 2254 Cases, Rule 7, and submit all of that evidence through deposition testimony and other documentary evidence. Resolving the claim on the basis of such evidence was, under the circumstances of this case, not an abuse of discretion. Belmontes had a fair opportunity to develop the factual record in support of his claim before the district court. Thus, his constitutional rights were not violated by the magistrate judge's denial of his motion for an evidentiary hearing based on oral testimony.

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

### a.  Deficient Performance[9]

Under *Strickland*, counsel's competence is presumed. Thus, Belmontes must rebut this presumption by demonstrating that Schick's performance was unreasonable under prevailing professional norms and was not the product of sound trial strategy. *See id.* at 688-89. Judicial scrutiny of counsel's performance is highly deferential, and thus we must evaluate Schick's conduct from his perspective at the time it occurred, without the benefit of hindsight. *Id.* at 689. "[S]trategic choices made after thorough investigation of [the relevant] law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. However,

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be

---

[9]The district court held that Schick's performance was deficient and the dissent does not dispute this holding. Instead, our colleague argues that Belmontes was not prejudiced by Schick's performance. His dissent notes that courts need not determine whether counsel's performance was deficient before deciding whether it prejudiced the defendant. Dis. Op. at 6819. We agree and because all of the dissent's arguments pertain to the prejudice section of the ineffective assistance of counsel analysis, we will address them in that section of the opinion.

directly assessed for reasonableness in all the circumstances . . . .

*Id.* at 690-91; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690-91). Similarly, a decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an informed decision. *Wiggins*, 539 U.S. at 522-23; *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004).

Although the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms,' " *Wiggins,* 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688), "general principles have emerged regarding the duties of criminal defense attorneys that inform our view as to the 'objective standard of reasonableness' by which we assess attorney performance, particularly with respect to the duty to investigate," *Summerlin*, 427 F.3d at 629.

**[3]** Specifically, we have held that " '[t]o perform effectively . . . counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (citing *Mayfield v. Woodford,* 270 F.3d 915, 927 (9th Cir. 2001) (en banc)); *see also Summerlin,* 427 F.3d at 630. Indeed, " 'it is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.' " *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) (quoting *Caro*, 165 F.3d 1223, 1227 (9th Cir. 1999)).

**[4]** Accordingly, attorneys representing defendants in capital sentencing proceedings have "an 'obligation to conduct a

thorough investigation of [the defendant's] background.' " *Mayfield*, 270 F.3d at 927. They also have a " 'duty to investigate and present mitigating evidence of mental impairment' . . . [,] [which] includes examination of mental health records." *Summerlin*, 427 F.3d at 630 (quoting *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998) and citing *Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir. 1989)); *see also Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). Furthermore, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d at 1254. "The defendant's history of drug and alcohol abuse should also be investigated." *Summerlin*, 427 F.3d at 630 (citing *Jennings v. Woodford*, 290 F.3d 1006, 1016-17 (9th Cir. 2002)).

**[5]** Moreover, "when 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright v. Schriro,* 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting *Stankewitz,* 365 F.3d at 719-20); *see also Stankewitz*, 365 F.3d at 754-55 (finding ineffective assistance where counsel failed to thoroughly investigate the defendant's childhood, history of drug abuse, and mental health problems notwithstanding the fact that he was on notice that such an investigation might yield mitigating evidence); *Summerlin*, 427 F.3d at 632 (finding ineffective assistance in a case in which counsel failed to obtain readily available evidence concerning possible mental state mitigation where his client's prior attorney told him there were indications that the defendant was mentally ill); *Mayfield*, 270 F.3d at 928 (finding ineffective assistance where counsel did not consult the appropriate medical experts or collect relevant records after "his investigator's limited efforts revealed evidence of diabetes and substance abuse," and failed to explain to the jury the relevance of the evidence that was presented).

In *Douglas*, for example, we held that petitioner's trial counsel had been ineffective because he failed to adequately

investigate and present evidence related to Douglas's traumatic childhood, positive attributes, and mental health problems, and failed to adequately prepare several lay witnesses for their testimony at the penalty phase of Douglas's capital trial. 316 F.3d at 1088-89. Douglas was convicted of sexually assaulting, torturing, and brutally murdering two teenage girls, and the State sought the death penalty. *Id.* at 1084. At the penalty phase of his trial, Douglas's counsel presented the testimony of Douglas's wife, his son, a friend, and a neighbor. *Id.* at 1084. Two of these witnesses

> testified that Douglas had an aversion to the sight of blood and several testified as to his nonviolent nature, in an apparent attempt to focus on "lingering doubt" of whether [a cooperating witness's] story was completely true. . . . [Douglas's] family members testified in very general terms that Douglas had been orphaned and had a difficult childhood, running away from home at fifteen to join the Marines. They also indicated that Douglas was very poor growing up. . . .

*Id.* at 1087. Evidence presented to the district court at the evidentiary hearing on Douglas's ineffective assistance of counsel claim demonstrated that, although trial counsel was "on notice that Douglas had a particularly difficult childhood, . . . [he made] no attempt to contact persons who might have had more detailed information about Douglas's past." *Id.* at 1088. Even though counsel "knew that Douglas had spent a great deal of time locked in a closet [as a child], a factor which contributed to his severe claustrophobia, [counsel] did not elicit any testimony regarding this fact from Douglas's family." *Id.* Moreover, although it was "easy to ascertain that Douglas's line of work exposed him to toxic solvents, . . . [counsel] did not investigate the effects of this exposure or inform the mental health experts who [he hired to evaluate] Douglas of this fact." *Id.* at 1088-89. Finally, counsel "spent virtually no time preparing [his] witnesses for their testimony at the penalty

phase." *Id.* at 1087. His failure to do so "meant that the testimony that was introduced was less than compelling." *Id.* at 1088.

Assessing counsel's mitigation investigation and preparation for the penalty phase under the standards set forth above, this court concluded that

> although [counsel] did perform some investigation, it was constitutionally inadequate. The information [counsel] did obtain about Douglas's troubled childhood revealed the need to dig deeper, and he did not adequately prepare the witnesses in order to present the material he did gather to the jury in a sufficiently detailed and sympathetic manner. We therefore conclude that [counsel's] investigation and presentation of social history at the penalty phase was deficient.

*Id.* at 1089.

The facts of the case at hand and those in *Douglas* are quite similar.[10] Here, as in *Douglas*, Schick failed to consult with experts and adequately investigate obvious leads in the record that would have led him to mitigating evidence about Belmontes's mental state, humanizing evidence about his traumatic childhood, and positive character evidence. Also as in *Douglas*, Schick failed to prepare lay witnesses to effectively present character evidence about Belmontes that would inform the jury of his positive qualities. Finally, as in *Douglas*, Schick failed to present expert witnesses who could testify about Belmontes's mental state and explain the significance of the mitigating evidence to the jury. Each of these failures were unreasonable under professional norms and independently constitute deficient performance.

---

[10]The dissent attempts to distinguish the two cases, but its analysis is limited to the issue of prejudice. Dis. Op. at 6838-39. In this section, however, we consider only the issue of deficient performance and the dissent does not dispute our analysis. We discuss prejudice below.

First, Schick failed to consult experts and otherwise adequately investigate mitigating evidence for the penalty phase, notwithstanding the fact that he knew such evidence potentially existed. Although Schick hired a mental health expert, Dr. Cavanaugh, to evaluate Belmontes for purposes of the guilt phase, he did not, as the district court found, ask Dr. Cavanaugh to comment on any issues relevant to the penalty phase, and did not consult any other psychologist or psychiatrist with respect to the relevance of, or need for further development of the mitigating evidence regarding Belmontes's troubled childhood or mental state. Obtaining competency evaluations from mental health experts for guilt phase purposes does not discharge counsel's duty to consult such experts for the penalty phase because the considerations involved are very different in the two phases. *See Summerlin*, 427 F.3d at 642. This failure to consult a psychologist or psychiatrist about the significance of the mitigating evidence would have been unreasonable in any capital case, but was particularly unreasonable here, given the information Schick had at the time he made this decision.

First, Dr. Cavanaugh's report indicated a "lack of early markers" of anti-social personality disorder. Had Schick bothered to ask what this meant, he would have realized that this finding would strongly support the argument that Belmontes's adverse experiences in his early teens changed his life and his personality from that of a normal, well-behaved young man to that of a disturbed, depressed, and drug addicted nineteen year old, an argument that Schick failed to make, but one that, if properly developed, might well have humanized Belmontes and elicited the sympathy of members of the jury. Second, Cavanaugh's report mentioned that Belmontes had an extensive history of substance abuse, and that his use of drugs and alcohol negatively affected his impulse control. A reasonable attorney presented with this information would have consulted with Cavanaugh or another potential expert regarding whether such a finding, though unhelpful at the guilt phase, might be useful at the penalty phase either to explain how

Belmontes's harmful youthful experiences may have led to his turning to substance abuse to help him cope with the trauma in his life or to describe how those experiences when coupled with the related substance abuse may have contributed to Belmontes's criminal conduct.[11]

In addition to failing to consult a psychologist or psychiatrist about the availability of mitigating evidence after reading Cavanaugh's report, Schick failed to pursue a host of other obvious leads, many of which would have caused him to discover significant additional mitigating evidence. Although Schick knew that Belmontes had participated in Cadets, Little League, and team sports, and that he had been a well-behaved and likeable child, Schick did not investigate whether evidence could be presented regarding the positive attributes that Belmontes possessed, evidence that might have humanized him in the eyes of the jurors and given them an affirmative reason to spare his life.

Schick was also aware that Belmontes had suffered from rheumatic fever and other illnesses as an adolescent, and knew that these illnesses had been markedly debilitating and that he had been hospitalized many times, yet he neither sought nor obtained Belmontes's medical or hospital records, nor did he uncover the easily obtainable evidence that Bel-

---

[11]Contrary to the dissent's suggestion, we do not hold that Schick could have or should have presented an expert who would testify that substance abuse led Belmontes to lose control of his impulses and murder McConnell. Rather, we hold that Schick's failure to investigate Belmontes's mental state and history of substance abuse constituted deficient performance. The dissent confuses the failure to *investigate* evidence with the prejudice that would follow from failing to *introduce* it. Here, we simply point out Schick's failure to fully investigate Belmontes's mitigating circumstances. We discuss below in the prejudice section the effect of Schick's failure to conduct the proper investigation and obtain the necessary witnesses. In that section, we consider what a reasonably competent attorney would have done with the witnesses and evidence that Schick should have uncovered.

montes was told repeatedly that he should expect to die before he reached the age of 21.

Schick knew that Belmontes had dropped out of school in the tenth grade and that he struggled academically, yet Schick did not obtain any of Belmontes's school records or contact any of Bemontes's former teachers, and did no other investigation of this issue. He did not, for example, seek to discover whether Belmontes's conduct in this regard was a result of any of the traumatic events he had experienced. Further, although Schick knew that Belmontes was abusing marijuana, PCP, heroin, amphetamines, and LSD around the time of the offense, he did not investigate whether mitigating evidence related to Belmontes's drug use existed or should be introduced.

Schick also knew that psychological testing had been performed on Belmontes by Dr. Yates during his time at the CYA, the results of which were easily obtainable had Schick requested these records. Despite this knowledge, Schick did not obtain a copy of results of the psychological testing, did not discuss Dr. Yates's evaluation of Belmontes with her or with any other psychiatrist or psychologist, and did not seek an independent evaluation of Belmontes's mental health or personality traits for purposes of the penalty phase.

Alternatively, Schick was aware that Belmontes's CYA file contained numerous references to the those qualities that made him a good candidate for positive institutional adjustment. Notwithstanding the presence of multiple such leads, Schick did not attempt to obtain any additional information about the incidents of positive conduct described in the CYA file, nor did he discuss with any psychologist or psychiatrist or other potential expert Belmontes's prospects for positive institutional adjustment.

Schick's failure to pursue these obvious leads, many of which would have led to the discovery of compelling mitigat-

ing evidence, was clearly unreasonable and fell below standards of professional competence extant in 1982. *See Lambright,* 490 F.3d at 1119-20; *Stankewitz,* 365 F.3d at 719-20; *Douglas,* 319 F.3d at 1098; *Bean*, 163 F.3d at 1080. This is especially true given that Schick conceded that his failure was not a result of any tactical or strategic decision on his part and admitted that he simply had not thought of conducting the most rudimentary of investigations regarding Belmontes's mental state.

In addition to failing to investigate adequately, Schick did not effectively prepare the lay witnesses he called to testify.[12] We do not mean to suggest, as the dissent implies, that Schick should have coached the witnesses. However, he had a duty to discuss with them the purpose of their testimony, reveal the type of questions he planned to ask them on the stand, and instruct them as to what kind of information the jury would find helpful and what kind of testimony would not be relevant. It is evident from the testimony given at the penalty phase that Schick did not do this. Several of the witnesses who knew Belmontes best and clearly could have provided compelling mitigating evidence did not testify to a single positive quality he possessed. Instead, witness after witness told the same jury that had just found Belmontes guilty of first degree murder beyond a reasonable doubt, that Belmontes should not receive the death penalty because he was innocent.[13]

---

[12]Although Schick claimed it was his practice to interview witnesses before their actual testimony, he could not specifically recall interviewing the penalty phase witnesses in this case. There were only three entries in Schick's time log related to penalty phase witness preparation and those time intervals were also spent completing other tasks, including trial preparation, that likely took up the bulk of the minimal number of hours he logged.

[13]The dissent makes the untenable claim that the witnesses' belief that Belmontes was innocent had a mitigating effect on the jury. All of the witnesses who testified that they believed he was innocent admitted, of their own volition or at the prodding of the prosecution, that they were not familiar with the facts of the case. (The only exception to this was Bel-

Most glaringly, Belmontes's own mother did not offer a single reason not to execute her son, although she obviously could have done so had she been properly advised regarding the purpose and nature of the inquiry.[14] Belmontes was similarly ill-prepared to testify and to address the jury at the close of the penalty phase. As a result, he could not name a single positive, productive thing he would do if given a life sentence, asked the jury not to rely on the few unconnected pieces of mitigating evidence that Schick somehow managed to adduce,[15] and spent a majority of his closing statement telling the jury that the prosecutor did not know whether he had murdered McConnell because "he wasn't there" and "he doesn't know me."

Schick's presentation of lay witness testimony at the penalty phase failed to fulfill its purpose of humanizing Belmontes or providing the jury with any reason to spare his life. Competent counsel would have met with the lay witnesses, discussed their testimony, and elicited the relevant information from them on the stand. Schick's failure to prepare the lay witnesses and effectively present their testimony constitutes deficient performance. *See Douglas*, 316 F.3d at 1089.

---

montes's mother, but it is not significant or surprising that a mother would think her own son incapable of killing another human being). It is far more likely that the jury would interpret the witnesses' insistence on Belmontes's innocence as evidence of their ignorance, or perhaps loyalty, than, as the dissenting opinion suggests, as an indication that "Belmontes was normally not a violent person." Dis. Op. at 6841.

[14]The dissent notes that Belmontes's mother "told the jury that Belmontes had a close relationship with his sister." Dis. Op. at 6840. This trivial observation was the only positive attribute that Schick managed to extract from the defendant's own mother in the course of her otherwise damaging testimony. Likewise, the rest of the positive testimony from other witnesses that the dissent cites, Dis. Op. at 6840-41, was cursory and overshadowed by the witnesses' repeated and unhelpful insistence that Belmontes was innocent.

[15]In his address to the jury, Belmontes insisted that he did not want to use his traumatic childhood experiences as a crutch.

Additionally, Schick failed to call an expert witness who could have synthesized the various elements of the information about Belmontes and explained the factors that led to Belmontes's criminal activity. Such an expert could have explained to the jury that Belmontes was a well-adjusted, likeable child who showed great promise despite his family's instability and poverty. The death of his sister at an early age and subsequent struggle with rheumatic fever, plus the social isolation and depression that accompanied it, however, had profound psychological and social effects on him. An expert could have explained to the jury how such experiences could have led an individual to abuse drugs and alcohol and become involved in criminal activity.

The absence of such an expert was particularly damaging given Schick's failure to explain the significance of the mitigating evidence in his closing statement at the end of the penalty phase. He did not, as noted earlier, even mention any of the evidence that might have humanized Belmontes. He did not refer to any of the traumatic events that helped shape Belmontes's personality and were responsible for transforming him from a peaceful, likeable child to the disturbed person who murdered Steacy McConnell, and did not attempt to explain the connection between the two. Nor of course did he explain the relevance of the evidence relating to Belmontes's youth and childhood, including his serious illness, to the jury's task of determining whether Belmontes was deserving of a life sentence rather than execution. Although Schick stated in his deposition that one of his four themes at the penalty phase was Belmontes's capacity to adjust well to prison, he failed to argue that such was the import of the testimony of any of the witnesses he had called to testify. *Cf. Mayfield*, 270 F.3d at 928 (finding ineffective assistance in part based on counsel's "fail[ure] to explain to the jury the significance of the mitigating evidence presented"). Instead he said only that Belmontes was ill-equipped to make it outside of prison. Perhaps as detrimental as these glaring omissions were the arguments that Schick did make to the jury. Indeed, the main

thrust of his closing was the perverse argument that, if the jurors really despised his client, they should sentence him to life in prison rather than death because death would be the more "lenient" punishment.

**[6]** In sum, the record makes plain that Schick's presentation of evidence at the penalty phase did not take place after " 'all relevant mitigation information [was] unearthed for consideration,' " *Douglas*, 316 F.3d at 1088 (quoting *Caro*, 165 F.3d at 1227). Instead, Schick ignored "tantalizing indications in the record . . . that 'would [have] le[ ]d a reasonable attorney to investigate further.' " *Stankewitz*, 365 F.3d at 720 (quoting *Wiggins*, 539 U.S. at 527). As a result, substantial evidence in mitigation that might have humanized Belmontes and affected the outcome of the penalty phase proceeding was not provided to the jury. Compounding his failure to investigate, Schick then failed to adequately prepare his witnesses to testify with the result that their testimony was unhelpful and possibly even damaging. Furthermore, he failed to present an expert to explain the relevance of the available mitigating evidence to the jury. Remarkably, he also failed to explain to the jury in his closing argument the relevance of the small quantum of mitigating evidence he did introduce, and failed to make any of the critical humanizing arguments that might influence a jury in the case of a nineteen-year-old youth. Instead, he relied principally on the unsympathetic and not very credible argument that a life sentence is harsher punishment than execution. *Cf. Douglas*, 316 F.3d at 1088-89; *Mayfield*, 270 F.3d at 928. Such representation falls far below that which a reasonably competent attorney would provide in a capital case. Accordingly, we affirm the district court's holding that Schick's representation at the penalty phase of Belmontes's trial was deficient.

### b. *Prejudice*

#### i. *Legal framework*

To establish prejudice, Belmontes must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one " 'sufficient to undermine confidence in the outcome,' " but is "less than the preponderance more-likely-than-not standard." *Summerlin,* 427 F.3d at 640, 643 (quoting and citing *Strickland*, 466 U.S. at 693-94). Accordingly, "[i]n establishing prejudice under *Strickland,* it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll v. Ryan*, 465 F.3d 1006, 1018 (9th Cir. 2006) (citing *Williams v. Taylor*, 529 U.S. 362, 398 (2000)); *see also Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test."). Instead, in evaluating prejudice, we must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently," *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate whether the difference between what was presented and what could have been presented is sufficient to "undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. Prejudice is established if "there is a reasonable probability that at least one juror would have struck a different balance" between life and death. *Wiggins*, 539 U.S. at 537.

**[7]** Applying these standards, we have held that counsel's failure to investigate and present available evidence regarding a capital defendant's troubled childhood, physical illness, mental state, and drug use is sufficient to undermine confidence in the result of a sentencing proceeding, and thereby to render counsel's performance prejudicial. *See, e.g., Douglas,*

316 F.3d at 1089; *Mayfield,* 270 F.3d at 932; *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001); *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998). We have likewise found prejudice based on counsel's failure to adequately prepare and present the mitigating evidence that he introduces, and to adequately explain to the jury the relevance of that mitigating evidence. *See Lambright,* 490 F.3d at 1122-23; *Douglas*, 316 F.3d at 1088-89; *Mayfield*, 270 F.3d at 928.

### ii. *Lay witnesses*

**[8]** As a result of Schick's deficient performance, the jury never heard much of the available lay witness testimony about significant mitigating circumstances of Belmontes's life including his difficult childhood, serious physical illness, drug abuse, and positive attributes. Specifically, in addition to presenting evidence demonstrating that Belmontes was born to a teenage mother and grew up in a poverty-stricken family in which his father, an alcoholic, beat his mother severely and regularly, Schick could have introduced substantial additional mitigating evidence. He could have established through the testimony of lay witnesses that Belmontes had to deal with a host of other traumas and adversity during his childhood and adolescence. Such mitigating evidence serves to humanize the defendant and is critical in the determination of whether a jury should spare the defendant's life. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (holding that the purpose of mitigating evidence is to ensure that the jury "treat[s] the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence" (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)) *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)); *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) ("The sentencing hearing is defense counsel's chance to show the jury that the defendant, despite the crime, is worth saving as a human being.").

Schick failed to call witnesses to testify that when Bel-
montes was five years old, his 10-month-old sister died of a
brain tumor. After her death, Belmontes exhibited symptoms
of depression and would repeatedly visit the cemetery where
his sister had been buried. Belmontes also suffered as a result
of his maternal grandmother's alcoholism and prescription
drug addiction, which, in combination with her manipulative
and controlling behavior, caused constant strife within both
his immediate and extended family. Schick could also have
introduced testimony about Belmontes's positive attributes
and strong character as a child in the face of adversity; he was
a kind, responsible, and likeable child who got along well
with his siblings, was respectful towards his grandparents
despite their disapproval of his mixed racial background, par-
ticipated in community activities, kept up in school and got
along with his teachers before his illness, and made friends easi-
ly.[16]

Other humanizing evidence that lay witnesses could have
presented includes Belmontes's debilitating struggle with
rheumatic fever that left him isolated from his peers and
depressed and his family's period of wholly inadequate living
conditions—a single room in a cheap motel where his mother

---

[16]The dissent suggests that such positive testimony about Belmontes's
character as a child would not be forthcoming and points to old reports in
which police and probation officers made negative comments about Bel-
montes in his late teens after he became involved in criminal conduct. Dis.
Op. at 6836 n.21. We first note that those officials came into contact with
Belmontes long after the psychological and social effects of his illness and
family trauma manifested themselves. The positive character evidence to
which we refer is the testimony of those who knew Belmontes as a child
and could speak to his promising character in the face of poverty and fam-
ily violence. Second, it is unlikely that police and probation officers would
be the best source for positive reports about an individual who came to
their attention after committing a crime—no matter how minor. In short,
it makes little sense to contend that negative evidence of Belmontes's
character found in police interviews and probation officer reports some-
how undermines testimony about Belmontes's strong character as a child
long before he became involved with the criminal justice system.

frequently had sex with various men.[17] Additionally, Schick could have presented testimony about how these tragic circumstances led him to engage in regular drug use beginning when he was in his early teens. By the time of McConnell's murder—indeed earlier than then—he was regularly using

---

[17]The dissent attempts to downplay the severity of Belmontes's illness, family trauma, and living conditions. In response to overwhelming evidence of an unstable and unhappy family life, the dissent attempts to show that there were "positive aspects of Belmontes's family relationships." Dis. Op. at 6832. The only "positive aspect" of his family life that the dissent can actually point to, however, is the account given by Belmontes's surviving sister, who did *not* testify at trial, of the Sundays that the Belmontes children would spend with their father after their parents' separation. *Id.* Despite the dissent's characterization of her memory of these days as "positive," her testimony is neutral at best. The relevant portion of her declaration states: "My father drank a lot and had a very strong personality. I was about five years old when my parents separated. My father came to pick us up on Sundays, and he took us for rides or to our paternal grandmother's house. We spent the whole day together, but we never did much because he never had any money."

The dissent also downplays the effect of Belmontes's illness by quoting Belmontes's sister's declaration in which she states that she did not "notice or understand emotional changes in him" due to rheumatic fever. Dis. Op. at 6833. Conveniently absent from the dissent is Belmontes's sister's explanation of why she did not "notice or understand" the changes in Belmontes—she was very young when he became ill. Belmontes's sister's childhood recollection of her brother's behavior after his bout with rheumatic fever, which she qualified with a reference to her young age, hardly undermines the rest of the strong evidence in the record that the illness had a profound effect on Belmontes.

Finally, the dissent claims that Belmontes did not stay at the motel very often in an attempt to minimize the evidence about Belmontes's wretched living conditions. Dis. Op. at 6833. If anything, this statement casts Belmontes's living situation in a *more* sympathetic light. The only place that Belmontes could call home during his teenage years was one motel room shared by five people so he was forced to sacrifice a stable home life and find shelter in other places. Additionally, the record reflects that one reason that Belmontes did not stay at the motel was that his own mother used to lock him out of the room, probably while she was engaged in sexual encounters with strangers.

marijuana, heroin, LSD, PCP and other drugs, to help cope with the unpleasant circumstances of his life.[18]

Of all the available mitigating evidence described above, the jury heard only that Belmontes's father was a violent alcoholic, that the family was poor, that Belmontes became a born-again Christian while incarcerated, and that at the same time he went from last man to number two man in the Pine Grove fire brigade. The jury never heard testimony about the traumas that Belmontes faced as a youth; it never heard that he possessed many positive attributes, and it never heard that he had struggled with substance abuse since his early teens. In *Mayfield*, this court held that if the jury had heard the testimony "of available friends and family members relating additional humanizing stories," about the defendant's good character and the difficulties he faced as a youth, which changed his personality and led him to substance abuse and

---

[18]We do not suggest that Belmontes was under the influence of drugs during the commission of the murder. Nor do we suggest, as the dissent claims, that Schick should have presented expert mental state evidence that Belmontes was less culpable for the McConnell killing because he was under the influence of drugs when he killed her. Our point is only that evidence of Belmontes's drug use should have been presented to humanize him by showing how the tragic circumstances he experienced while growing up adversely affected him. Just as Belmontes's criminal activity was a manifestation of the trauma he suffered during his difficult childhood, so too was his drug use. For example, Murillo, Belmontes's ex-girlfriend, could have testified that Belmontes engaged in risky behavior such as drug use out of hopelessness because he thought that he was going to die young. The mitigating evidence need not have any connection whatsoever to the crime in order to be relevant and humanizing. *See Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004); *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998). Although the district court held that if Belmontes had attempted to present expert testimony that drugs influenced his behavior *at the time of the crime*, the rebuttal evidence about Belmontes's role in the murder of another individual, Jerry Howard, would have been admissible to prove that he was capable of committing murder when he was sober, the district court did not hold that humanizing evidence about Belmontes's history of substance abuse before the crime would likewise open the door to additional aggravating evidence.

crime, "there is a reasonable probability that the omitted evidence would have changed the conclusion." 270 F.3d at 932 (quoting *Strickland*, 466 U.S. at 700) (internal quotation marks omitted). Likewise, if the jury had considered the additional humanizing evidence that Schick could and should have presented through lay witness testimony in this case, there is a reasonable probability that the jury would have come to a different conclusion about Belmontes's sentence.

Accordingly, the district court's conclusion that Belmontes was not prejudiced by counsel's performance because "Schick introduced testimony as to most of the factual matters" that Belmontes argues should have been presented is clearly erroneous; it is also inconsistent with our law. Indeed, as noted above, the jury heard testimony as to only a few of the numerous adverse experiences that Belmontes had suffered as a youth, heard nothing about their effect on him, and heard almost nothing about his positive attributes.

As we have often noted, the fact that a capital jury was presented with a cursory or incomplete presentation of the mitigating circumstances that should have been more thoroughly and fully presented does not obviate a finding of prejudice. *See, e.g., Lambright,* 490 F.3d at 1125-26 (finding deficient performance and prejudice notwithstanding the fact that some information about various mitigating factors was before the sentencing court); *Correll*, 465 F.3d at 1015, n.5 (finding deficient performance and prejudice in spite of the fact that "the bare facts of [petitioner]'s troubled past were . . . presented to the court"); *Stankewitz,* 365 F.3d at 1090 (finding deficient performance and prejudice when counsel presented some mitigating evidence but "a more complete presentation, including even a fraction of the details [defendant] now alleges, could have made a difference"); *Douglas*, 316 F.3d at 1088 (finding deficient performance and prejudice where counsel "introduce[d] some of [the petitioner's] social history, [but] did so in a cursory manner that was not particularly useful or compelling"). To the contrary, only where counsel suf-

ficiently presents available mitigating evidence, or where he has a reasonable strategic reason for not doing so, can we have confidence in the outcome of a jury's penalty deliberations. Neither is the case here. If the jury had heard even a portion of the available humanizing lay testimony, it is likely that at least one juror would have chosen to spare Belmontes's life.

**[9]** In addition to being prejudiced by Schick's failure to present readily available and compelling mitigating evidence through lay witness testimony, Belmontes was also prejudiced by Schick's failure to adequately prepare the witnesses who offered the minimal evidence that he did introduce. As noted above, Schick's failure to prepare his lay witnesses resulted in a conspicuous absence of testimony both about the difficulties Belmontes encountered as a child and about his positive qualities—even from witnesses who knew him best, including his mother. Instead, the witnesses Schick produced insisted that Belmontes was innocent to the same jury that had just found him guilty of first degree murder beyond a reasonable doubt. Similarly, because Belmontes was not adequately prepared to address the jury, he could not name a single positive or productive thing he would do in prison if given a life sentence, and spent the majority of his closing statement telling the jury that the prosecutor did not know whether he had murdered McConnell because "he wasn't there" and "he doesn't know me." He also asked the jury to disregard the few mitigating pieces of evidence that Schick somehow managed to introduce into evidence. At the habeas hearing, Mr. Larsen and Mr. Margolin asserted that these sorts of blunders severely undermined the force of the mitigating witnesses' testimony, and may have even created a negative backlash amongst the jurors. Specifically, they concluded that the fact that several witnesses explicitly rejected the jury's guilty verdict may have antagonized it, and the fact that even Belmontes's own family members could not speak to his redeeming qualities may have led the jurors to believe that there was nothing positive to say about him. Thus, Schick's

failure to adequately prepare Belmontes and the witnesses appearing on his behalf resulted in testimony that was unhelpful, and likely even harmful. This also undermines our confidence in the outcome of the jury's penalty deliberations.

Moreover, in the absence of expert testimony, it is especially important that counsel explain adequately to the jurors the significance of the mitigating evidence in his closing argument. Indeed, this court has held that "[t]o perform effectively in the penalty phase of a capital case, counsel must . . . engage in sufficient preparation to be able to 'present[ ] and *explain[ ] the significance* of all the available mitigating evidence.' " *Allen*, 395 F.3d at 1000 (*citing Mayfield,* 270 F.3d at 927 (en banc)) (emphasis added). Schick did not explain the mitigating evidence to the jury in his closing argument at all. He did not even mention the relevant mitigating circumstances, let alone suggest any connection between the traumatic events that occurred in Belmontes's childhood and his later behavior. Without expert testimony to make that connection for the jurors, Schick had an even greater obligation to do so himself. Defense counsel's failure to give a thorough and persuasive closing argument can prejudice the defendant, especially when, as here, the closing argument is the only opportunity for counsel to compensate for deficiencies in the presentation of evidence. *See Pizzuto v. Arave*, 385 F.3d 1247, 1259-61 (9th Cir. 2004) (holding that counsel's failure to remind the jury of relevant evidence from the guilt phase in his penalty phase closing arguments prejudiced the defendant). Schick squandered his closing argument. Instead of explaining why the jury should vote for a life sentence rather than capital punishment, he argued that a life sentence constituted harsher punishment than the sentence of death. The district court simply "misremembered" the facts or misunderstood the law when it concluded that the jury did not need professional help "beyond defense counsel's argument" to understand Belmontes's mitigating evidence. There was no such argument, notwithstanding counsel's obligation to present it.

**[10]** On the basis of Schick's failure to prepare and present available lay witness testimony humanizing Belmontes and his failure to explain the significance of the little humanizing evidence he actually presented to the jury, we conclude that Belmontes was prejudiced by his counsel's deficient performance, that our confidence in the verdict is undermined and that, accordingly, his death sentence must be set aside.

### iii. Expert Witnesses

**[11]** In addition, although the failure here is not essential to our conclusion, Belmontes argues and we agree that Schick failed to provide the jury with expert testimony that would have explained the significance of, and elaborated upon, both the lay testimony that was presented and the lay testimony that should have been presented. Specifically, in addition to presenting the evidence described above, Schick should have offered the testimony of a psychologist or psychiatrist in order effectively to explain to the jury in day-to-day terms the practical impact on an individual of the kind of traumas that Belmontes experienced as a child and adolescent. Such an expert could have explained to the jury the psychological impact on a child of his father's serious alcoholism, of witnessing severe domestic violence between his parents, of his family's poverty, of his mother's humiliating sexual performances, of being severely ill during a critical stage in his social development, of his depressive reactions to being told he would not live past 21, and of his history of substance abuse. Such an expert also could have explained the extent to which these problems can cause or contribute to a change in individuals that can lead to subsequent criminal conduct.

The deposition testimony of Dr. Missett, which Belmontes submitted to the district court, reveals that expert testimony likely would have provided an additional reason to conclude that he received ineffective assistance of counsel. Dr. Missett testified that, prior to the onset of rheumatic fever, Belmontes was functioning well compared to children with similar histo-

ries, a fact that suggests that Belmontes possesses positive and conforming core personality traits. Dr. Missett further testified that, "had [Belmontes] been able to continue to capitalize on [these] assets . . . the expectation is that would have had a rather good prognosis for his life." However, his rheumatic fever and the resulting social isolation "intensified [his] sense of himself as defective, something from which he never recovered . . . after that." According to Dr. Missett, this in turn led to Belmontes's depression, susceptibility to peer pressure, substance abuse problems,[19] and his eventual involvement in criminal activity.

A lay juror is not trained to identify the specific psychological and behavioral consequences of the traumas that Belmontes experienced. This is particularly true with respect to the consequences of Belmontes's bout with rheumatic fever and his subsequent history of substance abuse. Accordingly, expert testimony should have been presented with respect to these issues. *See Mayfield*, 270 F.3d at 932 (finding prejudice in part based on the fact that the jury did not have the opportunity to "consider[ ] the testimony of experts in endocrinology and toxicology" who could have explained the impact of the defendant's struggle with diabetes and use of drugs); *Douglas*, 316 F.3d at 1090 (finding prejudice in part based on the fact that counsel's argument that petitioner's troubled past

---

[19]The dissent agrees that evidence of Belmontes's pattern of self-medication through drug use following his illness and social isolation would have elicited sympathy from the jury. Dis. Op. at 6830. The dissent contends, however, that such testimony would open the door to rebuttal evidence that Belmontes was actually a drug dealer. *Id.* However, the slim evidence that the dissent references would not have undermined the jury's sympathy. According to the police report that the dissent cites, an informant approached the Ontario police and stated that he could get Belmontes to buy heroin for him. The police gave the informant $24 and surveilled the transaction. The informant gave Belmontes the money and Belmontes brought him to a residence where he knew that heroin could be procured, purchased a small amount of heroin, and gave it to the informant. Although this transaction technically constituted a sale of drugs, it hardly qualifies Belmontes as a drug dealer.

had "created a 'demon' within him lacked force without some expert testimony to back it up."); *Caro*, 280 F.3d at 1258 (finding prejudice in part based on the fact that "the jury was not afforded the benefit of expert testimony explaining the effects that Caro's physiological defects would have on his behavior").

The jury never heard a credible expert like Dr. Missett testify about the impact on an individual of the kind of childhood traumas that Belmontes suffered or explain that involvement in criminal activity can sometimes be explained by the hardships an individual experienced as a youth. Even if such testimony would not have diminished Belmontes's culpability as a legal matter, it would have humanized him in the eyes of the jurors and allowed them to view him as an individual deserving of sympathy and mercy. Thus, Belmontes was also prejudiced as a result of Schick's failure to present expert testimony at the penalty phase, and such failure provides an independent ground for setting aside the death penalty.[20]

---

[20]The State does not assert on appeal that the type of expert testimony discussed in this section would open the door to the aggravating evidence of Belmontes's prior alleged criminal conduct, specifically that Belmontes committed an act of murder with regard to Jerry Howard. It argues only that the expert testimony about Belmontes's *potential for institutional adjustment* could lead to the admission of such evidence. (We deal with the separate issue of institutional adjustment in section II.B.2.c. *infra*.) The dissent, unlike the State, argues, however, that evidence regarding Howard's death would be admissible to test the basis for any expert opinion regarding Belmontes, including testimony as to the effect of childhood traumas upon future behaviors. Dis. Op. at 6823-24. We need not reach that question, however, a) because the State does not raise it on appeal, and b) because Schick's failure to present mitigating evidence from lay witnesses and to explain the relevance of such evidence to the jury provides a sufficient basis for reversal of his capital sentence. Even were we to reach the question whether the calling of an expert regarding childhood traumas and their effect would open the door to evidence regarding Howard, we would conclude that it would not. Obviously, the expert would know about the instant murder, and thus understand the gravity of Belmontes's criminal conduct. However, an expert's opinion as to whether a

set of circumstances during an individual's period of emotional development could lead to serious criminal conduct is in no way dependent on whether the defendant committed one or two murders or even on whether he committed any. The critical testimony from an expert is that as a matter of psychological experience and knowledge, certain childhood traumas can result in a person's becoming likely to engage in subsequent criminal conduct, not that they always do and not that they necessarily did in the particular case before the jury. There would be no basis for suggesting that such a professional opinion would be any different if the expert were informed that Belmontes committed two murders rather than one.

Further, if the prosecutor had argued that he would be entitled to offer into evidence his version of the Jerry Howard murder in connection with the expert testimony that Schick intended to present, that argument would most likely have been rejected by the court. Any decision to admit such evidence would have been at the discretion of the trial judge, who had found the Howard testimony generally inadmissible. Had there been any doubt, Schick could have determined the answer in advance by means of a motion in limine, and then decided whether or not to introduce the expert testimony, which would not in any event have been essential to Belmontes's defense had Schick presented sufficient lay testimony humanizing him.

The dissent also argues that a more effective mitigation presentation would also have opened the door to evidence that Belmontes was involved in a gang. The evidence of this alleged gang affiliation is slim at best. The only relevant portion of the record that the dissent can cite is a CYA document discussing an interview with detectives at the Ontario Police Department in which they stated that there were "rumors" that Belmontes was in the Black Angels gang. Also reported in that document but not mentioned by the dissent, however, is Belmontes's denial of any gang involvement and his mother's claim that Belmontes knew members of the Black Angels gang because they lived in the area, but that he was not a member of the gang. According to Belmontes's childhood friend, Belmontes was part of a "junior gang" loosely affiliated with the Black Angels, but this "gang's" activities did not amount to anything more than harmless pranks. As the dissent acknowledges, Belmontes's "gang affiliation" likely can be explained by peer pressure combined with his sense of inferiority and social isolation in his mostly white school, not by a criminal personality. *See* Dis. Op. at 6831-32.

### iv.    Other relevant considerations

Other considerations also make plain that Belmontes was prejudiced by Schick's deficient performance. The jury was required to weigh the aggravating evidence against the mitigating evidence and it could impose a sentence of death only if the aggravating evidence outweighed the mitigating evidence. The State conceded at oral argument that the evidence in aggravation introduced at Belmontes's trial was "scant."[21] This acknowledgment is consistent with our previous observation that the aggravating evidence presented by the prosecution was "minimal." *Belmontes II,* 414 F.3d at 1106. The district court also held that "the aggravating evidence actually presented to the jury did not make this a clear-cut case for application of the death penalty." With such minimal aggravating evidence, the presentation of more substantial mitigating evidence clearly could have tipped the balance and changed the result of the jury's penalty deliberations.

The dissent repeatedly quotes the California Supreme Court's characterization of the aggravating evidence in this case as "overwhelming."[22] Dis. Op. at 6819, 6826, 6833.

---

[21]The dissent accuses us of taking this word out of context and claims that the State used the word "scant" to describe the aggravating factors "*other than the circumstances of the crime.*" Dis. Op. at 6834. Our learned colleague is not correct. In the thirty-fourth minute of oral argument, the State declared that "we know here that the jury did in fact find death to be an appropriate punishment based on the scant aggravation that they were given here." It did not distinguish between the circumstances of the crime and the other aggravating evidence. Indeed, it went on to contrast the totality of the "scant" aggravating evidence that the jury *actually heard* with the aggravating evidence they *would have heard* if the evidence about Belmontes's involvement in the Jerry Howard murder had been admitted. Of course the State argued that "the death penalty was appropriate," as the dissent claims, Dis. Op. at 6834, but that does not change the fact that it characterized the aggravating evidence, *including* the circumstances of the crime, as "scant."

[22]The dissent's quotation of the California Supreme Court's decision is slightly misleading. The court described the circumstances of the crime as

Under the State's own argument, however, the only conceivably significant aggravating factor is the circumstances of the murder itself. While all murders are heinous to some degree, Belmontes's crime was not such as ordinarily leads to the imposition of capital punishment, at least where there are significant mitigating circumstances. The crime here did not involve multiple victims, torture, sexual sadism, or needless suffering on the part of the victim. When compared with the murders in many of the cases in which we have held that the defendant was prejudiced by his counsel's failure to adequately investigate and present mitigating evidence at the penalty phase, the circumstances of the crime in this case can hardly be characterized as "simply overwhelming." *See, e.g., Correll*, 465 F.3d at 1015 (finding counsel's failure to sufficiently investigate and present mitigating evidence prejudicial, even though the crime involved three murders and one attempted murder); *Ainsworth*, 268 F.3d at 870-71, 878 (finding such conduct by counsel prejudicial even though the defendant shot a woman in the hip, raped her as she bled from the gunshot wound, and confined her in her car, at times in the trunk, for 24 hours until she bled to death); *Wallace*, 184 F.3d at 1113, 1118 (9th Cir. 1999) (finding such conduct by counsel could be prejudicial even though the defendant stalked and killed two people and shot without killing two others the same night); *Bean*, 163 F.3d at 1075-76, 1081, (finding such conduct by counsel prejudicial even though the defendant beat to death one middle-aged and one elderly woman in order to rob

---

"overwhelming" when it was analyzing whether Belmontes was prejudiced by the erroneous admission of aggravating evidence that on one occasion he slapped his side to indicate that he was carrying a gun. *People v. Belmontes*, 755 P.2d 310, 348 (Cal. 1988). Commission of a murder is certainly "overwhelming" when compared to the incident described above, but that does not mean that the circumstances of the murder that Belmontes committed were "overwhelming" when compared to the circumstances of other capital murders, if only those in which the imposition of the death penalty has been reversed by this court for similar deficient performance on the part of counsel. See text following note.

them); *Hendricks v. Calderon*, 70 F.3d 1032, 1035, 1045 (9th Cir. 1995) (finding such conduct by counsel prejudicial even though defendant was convicted of shooting two men who paid him to have sex with them and, as the jury heard in rebuttal testimony during the penalty phase, was never charged with murdering three others).[23] Thus, given the circumstances of Belmontes's crime and the almost total absence of any other evidence in aggravation, counsel's failure to produce the significant additional mitigating evidence we have set forth above was without question prejudicial.

The prejudicial nature of Schick's deficient representation becomes clear beyond any doubt when one considers the fact that, even when presented with an incomplete, inadequate, and uncompelling presentation of the potential mitigating evidence, at least some members of the jury, perhaps a majority, had serious doubts during the deliberations as to the correct result. Specifically, the jury took a substantial amount of time to deliberate, and asked questions in the midst of its deliberations that suggested that some jurors were leaning toward a verdict of life without the possibility of parole.[24] Indeed, the

---

[23]The circumstances of Belmontes's crime certainly do not come close to the heinous murders in *Campbell v. Kincheloe*, 829 F.2d 1453 (9th Cir. 1987), which the dissent claims is analogous to the present case and on which it principally relies. Campbell forced a woman to engage in acts of sodomy by holding a knife to the throat of her one-year-old daughter. *Campbell*, 829 F.2d at 1456. He was convicted of first degree assault and sodomy after his victim and her neighbor testified against him. *Id.* Years later, when he was on work release, he returned to the victim's home and beat her, strangled her and slashed her throat and the throats of her daughter and the neighbor who testified against him. *Id.* All three bled to death. *Id.* In contrast to the vengeful, premeditated, and sexually violent crimes involving multiple victims at issue in *Campbell*, Belmontes's crime involved only one victim who was killed because she surprised Belmontes and his confederates during a robbery.

[24]The jury's deliberations also call into question the dissent's characterization of the aggravating evidence as "overwhelming." If the jury had found the evidence to be so "overwhelming," surely the paltry mitigation case that Schick presented would not have stood in the way of a swift deliberation and imposition of a death sentence.

jury's question, "Can the *majority* rule on life imprisonment?" suggests that at that point in the deliberation, a number of jurors were leaning toward life imprisonment. (emphasis added). Had counsel better prepared the witnesses to testify, had the jury been presented with the additional mitigating evidence that should have been introduced, and had the significance of that evidence been explained to the jury, there is a reasonable probability that at least some jurors, if not all, would have been persuaded that life without the possibility of parole, rather than death, was the appropriate penalty in this case. *Cf. Mayfield*, 270 F.3d at 932 (finding prejudice in part based on the fact that (1) the jury deliberated for approximately the same amount of time as Belmontes's jury and (2) it questioned the judge regarding unanimity in a similar way to Belmontes's jury). Given the facts regarding deficient performance and the district court's findings in that regard, the nature of the jury's question alone is sufficient to undermine our confidence in the outcome.

On the whole, this case is remarkably similar to *Mayfield*. As in *Mayfield*, there are two independent bases on which we can find ineffective counsel at the penalty phase—the failure to present sufficient mitigating evidence through lay testimony and the failure to provide adequate expert testimony. The evidence that counsel failed to introduce in *Mayfield* is very similar to that which Belmontes's counsel failed to introduce. Additionally, the nature of the jury deliberations in *Mayfield*, as in this case, undermine our confidence in the penalty phase verdict.

In *Mayfield*, the only witness that counsel presented at the penalty phase was Dr. Craig Rath. *Id.* at 928. Although we noted that the mitigation evidence that was presented was "substantial," we held that there was additional evidence that could and should have been offered to humanize Mayfield. Mayfield struggled with diabetes as a child and when he was seventeen his grandmother died, his mother moved the family, and his diabetes-related hospitalizations increased. *Id.* at 931.

These "stressors" led him to abuse drugs and alcohol and associate with the wrong crowd. According to the testimony of his family and friends at the evidentiary hearing, Mayfield was once a supportive, generous, cooperative person, but his personality changed as a result of his substance abuse and medical problems. *Id.* at 931-32. We held that if the jury could have heard this humanizing testimony, there is a reasonable probability that it would have come to a different conclusion with respect to Mayfield's sentence. *Id.* at 932. Like Mayfield, Belmontes was a sweet, agreeable child, but his medical problems, social isolation, and substance abuse changed him and eventually led him into criminal activity. Counsel's failure to present lay witness testimony to this effect prejudiced Belmontes just as it prejudiced Mayfield.

Another independent basis for our holding in *Mayfield* was counsel's failure to present expert testimony. At the evidentiary hearing, an endocrinologist testified about the difficulties that diabetics face monitoring and treating their illness as well as the side effects that Mayfield suffered. *Id.* at 930. Additionally, a psychiatrist testified about the psychological effects of Mayfield's difficult childhood and the increasing stress that he faced that eventually led him to lose control of himself and become involved in drugs and crime. *Id.* at 931. Finally, a toxicologist testified about the effects of PCP—a drug that Mayfield used regularly leading up to the crime. *Id.* We found that if the jury had heard the testimony of these experts, it might have decided to give Mayfield a life sentence rather than the death penalty. *Id.* at 932. As in *Mayfield*, counsel in this case could have presented expert testimony about the effect of childhood traumas on an individual and the way that those traumas can lead to subsequent substance abuse and criminal behavior. As in *Mayfield*, Belmontes was prejudiced by counsel's failure to present such expert testimony.

Moreover, the nature of the jury deliberations in *Mayfield* and in this case reveal the tenuousness of the verdicts. In *Mayfield*, after deliberating for four hours, the jury sent a

written question to the judge, which read, "Must all 12 jurors agree for the sentence of life without parole?" *Id.* The judge responded: "All jurors must agree if either verdict is reached." *Id.* The jury deliberated for an additional day before it reached a verdict. *Id.* This is similar to the question that the jurors posed to the judge in this case, although in the present case the jurors asked "Can the majority rule on life imprisonment?" As in *Mayfield*, the jury's question during deliberations undermines our confidence in the verdict. *Id.*

Although the facts in *Mayfield* are very similar to those in the present case, the case for a finding of prejudice in this case is even more compelling. In *Mayfield,* we described the aggravating evidence as "strong." Here, it is, in our words "minimal," or as the State puts it, "scant." In *Mayfield*, the defendant committed premeditated double homicide, going to the victim's house for the sole purpose of confronting and killing her and then killing a witness to the first murder as a cover-up. Here, by contrast, Belmontes went to the victim's house with the intention of burglarizing her home in the belief that no one was there rather than with the intent to kill.[25] The

---

[25]Indeed, the aggravating evidence in *Mayfield* was stronger than all of the possible aggravating evidence that the State could have put on against Belmontes, including the Jerry Howard murder. In *Mayfield*, there was strong evidence that the murders were planned in advance, coolly carried out, and motivated by vengeance. In the present case there was evidence of advance planning of the *robbery*, but the murder happened unexpectedly after the victim surprised Belmontes and his confederates. Belmontes had no advance motive to kill McConnell. Mayfield was convicted of killing two people. Belmontes was convicted of killing one person and alleged to have killed a second in an unrelated incident. Mayfield committed his crime without confederates, whereas Belmontes's culpability is diminished by the presence and influence of his accomplices. Although we hold that there was sufficient mitigating evidence that should have been introduced that, standing alone, would warrant a finding of prejudice, without the introduction of any evidence that could, under any theory, plausible or implausible, serve to open the door to the introduction of the Jerry Howard murder evidence, *Mayfield* would, like a number of other cases cited *supra* in the text, compel a finding of prejudice even if the Jerry Howard evidence were admitted.

other aggravating circumstances present in *Mayfield*—that the defendant once carried and fired a gun at the home of one ex-girlfriend, and that he had previously physically abused another ex-girlfriend—are not significantly different than the other aggravating circumstances present here. Additionally, in *Mayfield* we found the mitigating evidence that counsel had actually introduced to be "substantial." Here, by contrast, the mitigating evidence Schick presented at trial was insubstantial. Accordingly, we conclude that *Mayfield* is controlling and that under its reasoning, Belmontes is entitled to relief on his ineffective assistance of counsel claim.

### v.   *Summary*

[12] Because the substantial mitigating evidence that counsel failed to uncover and present to the jury would have been highly beneficial to Belmontes, because counsel's failure to adequately prepare the witnesses who did testify rendered their testimony of little value and sometimes counterproductive, because counsel failed in his closing argument to explain to the jury the pertinence of the minimal mitigating evidence that was adduced and instead urged the jurors to return a verdict of life in prison for the reason that it was a harsher punishment than a death sentence, because the aggravating evidence introduced at sentencing was "scant," because the circumstances of Belmontes's crime (the only aggravating factor the State even contends to be substantial) were far less egregious than those in a number of cases in which we have held that deficient performances by counsel prejudiced defendants, because the evidence counsel failed to present would have humanized Belmontes in the eyes of the jury, and because the duration of the jury's deliberations and the questions it asked the judge make plain that in the minds of at least some of the jurors this was a close case in which their verdict was uncertain during a portion of the deliberations, we conclude that Belmontes has established far more than is required to "undermine[ ] . . . confidence in the outcome" of the penalty phase verdict. *See Strickland,* 466 U.S. at 694. Accord-

ingly, we hold that the district court erred in finding that Belmontes was not prejudiced by counsel's deficient performance.

### c. Additional Basis for Prejudice

Belmontes argues that there is an additional reason he was prejudiced by Schick's deficient performance: Schick's failure to offer expert testimony with respect to Belmontes's prospects for institutional adjustment. Specifically, Belmontes asserts that Schick could have introduced the testimony of Dr. Yates, who would have testified that "in a situation of high structure and reasonable support"—i.e. prison—Belmontes "would be a low risk for violent behavior." Belmontes also asserts that Schick could have elicited similar, and perhaps even more powerful testimony from a witness such as Gerald Enomoto, the former Director of the California Department of Corrections and current United States Marshal for the Eastern District of California. Enomoto's deposition states that he would have testified that, despite the presence of some negative reports from CYA staff members, as a whole the reports in Belmontes's CYA file show a clear trend of improvement and positive adjustment. Dr. Missett could also have testified that, in his opinion, Belmontes "would have an extraordinarily high likelihood of a good institutional and nonviolent adjustment to a prison setting."

It is to this point that the State's brief is primarily addressed. The State's argument with respect to why the failure to offer this type of expert testimony was not prejudicial is that, had Schick presented such evidence, he would have opened the door for the prosecution to introduce evidence that Belmontes actually committed a deliberate murder of Jerry Howard rather than acted as an accessory after the fact to voluntary manslaughter. The State asserts that had the Howard evidence been introduced, the aggravating factors would have gone from "scant" to "overwhelming." The State does not contest the trial court's ruling that the Howard evidence was

barred as a general matter (except for the bare fact of Belmontes's conviction of "accessory after the fact" to voluntary manslaughter), but argues only that it would be free to introduce the full facts regarding his actual role in the crime in connection with its cross-examination of any of the expert witnesses who testified that he had a non-violent character. It contends specifically that if any experts testified regarding Belmontes's favorable prospects for behaving in a non-violent manner in a structured environment, the prosecution would have had the right to attempt to show that Belmontes was guilty of murdering Jerry Howard and was a more violent person than the witnesses may have thought.[26] Because we have held above that a) Belmontes has demonstrated that he was prejudiced by Schick's deficient performance because of the failure to call lay witnesses and that he is entitled to have his sentence set aside on that basis alone and b) he is also entitled to a reversal of his sentence because of his counsel's failure to call expert witnesses to testify as to the effect that the various childhood traumas he experienced would have had upon an otherwise normal child, we need not consider whether expert testimony as to Belmontes's ability to adjust to a structured environment would, in fact, have opened the door to the Howard evidence. Nor need we consider what his counsel might or might not have done with respect to the introduction of such testimony had the trial judge indicated that such would be his ruling.[27]

---

[26]The dissent seems certain that the prosecution would have been able to prove that Belmontes actually killed Howard. Dis. Op. at 6820. Additionally, after thoroughly describing the evidence that the prosecution proffered, the dissent curiously declares that "Belmontes does not deny the truth of this evidence." Dis. Op. at 6820 Belmontes has had no occasion to admit or deny the truth of this evidence because, despite the State's repeated attempts, the evidence was never held to be admissible.

[27]We do not concede, as the dissent claims, that the additional evidence of Belmontes's violent past would have been admissible if Belmontes had presented evidence of institutional adjustment. Dis. Op. at 6822. It is far from clear that the trial judge would have issued any such ruling or that if he had done so, Belmontes's attorney would have proceeded to introduce the additional evidence. See discussion at n.20 *supra*.

We believe, however, that even if the Howard evidence were admitted, Belmontes would still have been prejudiced by Schick's deficient representation at the penalty phase of his trial. The aggravating evidence, even with the addition of evidence that Belmontes murdered Howard, is not strong enough, in light of the mitigating evidence that could have been adduced, to rule out a sentence of life in prison. Many of our cases in which capital petitioners claimed ineffective assistance of counsel involved multiple murders and we nevertheless found prejudice because of counsel's failure to present sufficient mitigating evidence. *See, e.g., Correll*, 465 F.3d at 1015 (involving three murders and one failed attempted murder); *Mayfield*, 270 F.3d at 920-21, 932 (involving two murders and one attempted murder); *Wallace*, 184 F.3d at 1113, 1118 (involving two murders and two attempted murders); *Bean*, 163 F.3d at 1075-76, 1081 (involving two murders); *Hendricks*, 70 F.3d at 1035, 1045 (9th Cir. 1995) (involving two murders and rebuttal evidence of three additional murders). Had the jury heard the expert testimony regarding the childhood traumas that turned Belmontes from a good-natured child into a troubled, drug-using individual engaged in criminal conduct, the humanizing evidence and the explanation for his change in personality might well have persuaded at least one juror to vote for life in prison whether he had committed one murder or two. We have already held that counsel's deficient performance was prejudicial where the jurors knew of only one murder: We cannot presume that it would be rendered non-prejudicial simply because they were informed of a second.

Our colleague devotes a substantial portion of his dissent to the issue of the Howard murder evidence, as did the State on appeal. However, because we base our decision on Schick's failure to effectively present humanizing lay witness testimony, and it is undisputed that such testimony would not open the door to the Howard murder evidence, the dissent's arguments are irrelevant to our holding. Moreover, the State does not argue that the introduction of expert testimony

regarding the relationship between the traumas that Belmontes experienced as a child and his subsequent criminal conduct would have opened the door to the introduction of evidence regarding the Howard matter (and as we have explained, it would not). Thus, the Howard evidence is irrelevant as well to our holding that the failure to introduce expert testimony regarding the nature and effect of Belmontes's childhood traumas is separately and independently prejudicial. Finally, we believe, although we need not so determine, that even if counsel had decided to introduce evidence of Belmontes's prospects for institutional adjustment in the face of a court ruling that such evidence would allow the prosecution to introduce the Howard murder evidence, the structured environment evidence along with the other mitigating evidence that counsel should have introduced, might well have persuaded at least one juror to vote in favor of life without parole, notwithstanding the introduction of the Howard evidence.

## C. Evidence of Prior Criminal Misconduct

Belmontes argues that he "was deprived of due process by the introduction of aggravating evidence at the penalty phase, which suggested criminal activity, but which has never previously been adjudicated." We have previously held that consideration of unadjudicated criminal conduct for purposes of sentencing does not violate defendant's constitutional due process rights. *See United States v. Ibarra*, 737 F.2d 825, 827 (9th Cir. 1984).

In his supplemental brief, Belmontes argues that he is now entitled to relief under *Cunningham v. California,* ___ U.S. ___, 127 S.Ct. 856 (2007). This argument likewise fails. In *Cunningham*, the Court held that a sentencing court may not impose a sentence above the statutory maximum based on facts that were not found by a jury or admitted by the defendant. *See id*. at 860. Here, the maximum sentence authorized by the jury's guilt phase verdict was death.

**[13]** We recognize that capital sentencing is unlike the imposition of all other punishment, and the ordinary rules do not always apply. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ("[T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty . . . it [can]not be imposed under sentencing procedures that create[ ] a substantial risk that it would be inflicted in an arbitrary and capricious manner."). We need not decide, however, whether the rule regarding the admission of unadjudicated criminal conduct applies to capital cases because Belmontes was not prejudiced by the State's presentation of the comparatively minor occurrences at the penalty phase of his trial. Accordingly, we affirm the district court's denial of relief with respect to this claim.

## D. Failure to Instruct the Jury on the Consequences of a Non-Unanimous Verdict

Several hours after the jury began its penalty deliberations, it sent a note to the judge asking, "[w]hat happens if we cannot reach a verdict?" and "[c]an the majority rule on life imprisonment?" The court then reread to the jury the sentencing instructions it had previously given, which ended with the following statement: "[I]n order to make a determination as to the penalty, all 12 jurors must agree, if you can." Thereafter, the following exchange occurred:

| | |
|---|---|
| JUROR HAILSTONE: | If we can't, Judge, what happens? |
| THE COURT: | I can't tell you that. |
| JUROR WILSON: | That is what we wanted to know. |
| THE COURT: | Okay. I know what will happen, but I can't tell you what will happen. |

**[14]** Belmontes claims that his due process rights and his right to be free from cruel and unusual punishment were violated by the trial court's refusal to instruct the jurors on the consequences of a hung jury. Despite its intuitive appeal, this argument fails in light of *Jones v. United States,* 527 U.S. 373 (1999), in which the Supreme Court held that "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree." *Id.* at 381. The Court's rationale compels the conclusion that due process likewise does not require the giving of such an instruction. Accordingly, we hold that Belmontes's constitutional rights were not violated when the trial judge refused to instruct the jury on the consequences of a failure to reach a unanimous verdict with respect to the penalty. We therefore affirm the district court's denial of relief as to this claim.

## E. The Trial Court's Pre-Judgment of Belmontes's Motion to Reduce His Sentence

Under California law, when a jury returns a verdict of death, the trial judge is required to re-weigh the aggravating and mitigating evidence before imposing a judgment and sentence. Cal. Penal Code § 190.4(e). Here, after the jury reached its verdict with respect to penalty but prior to the hearing mandated by § 190.4(e), the judge sent a letter to all of the members of the jury thanking them for their service and telling them that their "decision is acceptable and shall be followed." Defense counsel objected to the letter on the basis that it suggested that "the Court had made a decision [on the § 190.4(e) motion] prior to fully reviewing and hearing everything that was going to be said." The trial judge responded that his statement in the letter to the jury was "not indicative of the Court having made up its mind nor is it a statement that would forbear any statements, evidence, testimony that would be offered on behalf of Mr. Belmontes. I think the statement was probably made for the therapeutic purpose more than a legal purpose." The California Supreme Court held that the statement in the letter to the jury was "patently improper," but

concluded that the judge did thereafter re-weigh the evidence and make an independent determination as to whether the aggravating circumstances outweighed the mitigating circumstances as required under California law. Specifically, the court held that

> [c]onsidering the improper remark in the context of the letter in which it was made, together with the court's credible explanation that it "was made for [a] therapeutic purpose more than a legal purpose," we conclude defendant has not established that the trial judge ultimately failed to make the "independent determination" respecting the appropriateness of the penalty verdict, as he was obliged to do under section 190.4, subdivision (e).

As evidence, it cited the fact that the trial judge did not adopt verbatim the prosecutor's proposed findings of fact and conclusions of law.

The district court held that "the California Supreme Court's conclusion that the trial court did render the required impartial judgment is entitled to deference as a factual finding," presumably pursuant to the former version of 28 U.S.C. § 2254(d).

Belmontes argues that the California Supreme Court's determination that the trial judge did not prejudge the § 190.4(e) motion is not a factual finding entitled to deference, but rather a determination regarding a mixed question of law and fact. We reject this argument. Whether or not the judge had made up his mind prior to considering Belmontes's memorandum of points and authorities in support of his § 190.4(e) motion is not a mixed question, but is instead a pure question of fact.

Belmontes also argues that the California Supreme Court's finding is not entitled to deference because the court "con-

ducted no hearing nor did it have a referee conduct any hearing regarding the trial court's conduct. Rather, the trial court [sic] simply reviewed the statements made on the record by the trial court after defense counsel complained about the letter to jurors and reached a conclusion that even though the trial court told jurors that their death sentence would be sustained, the trial court did not really mean it." (emphasis in original).

[15] We agree with the California Supreme Court that the trial judge's assertion in the letter to the jury was exceedingly improper. In addition, we are equally troubled by the judge's subsequent assertion that the statement in the letter did not in fact reflect his true views—that it was intended simply as juror therapy. A court's representation to the jury should always be truthful. Nevertheless, we hold that the district court did not err in refusing to reverse the California Supreme Court's factual determination that, "[c]onsidering the improper remark in the context of the letter in which it was made, together with the court's credible explanation that it 'was made for [a] therapeutic purpose more than a legal purpose,' . . . [the] defendant has not established that the trial judge ultimately failed to make the 'independent determination' respecting the appropriateness of the penalty verdict." Accordingly, we affirm the district court's rejection of this claim.

## III.  CONCLUSION

[16] We affirm the district court's ruling that Belmontes received deficient representation at the penalty phase of his trial, but set aside its ruling that he suffered no prejudice as a result. We hold that counsel's failure to introduce adequate lay witness testimony regarding Belmontes's childhood experiences and his failure to explain to the jury the consequences of the minimal mitigating evidence he did introduce was prejudicial, especially in light of the scant aggravating evidence and the uncertainty the jury indicated about the sentence it

should impose. We also hold that counsel's failure to introduce expert witnesses to testify to the relationship of the type of childhood traumas suffered by Belmontes to future criminal conduct, and thus to offer important mitigating expert testimony was prejudicial and thus provides a separate and independent basis for reversal, again especially in light of the circumstances referred to above. Accordingly, we remand to the district court with instructions to grant the petition for writ of habeas corpus and to return the case to the San Joaquin County Superior Court to reduce Belmontes's sentence to life without parole, unless the State pursues a new sentencing proceeding within a reasonable amount of time, as determined by the district court.

REVERSED and REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

> [Fernando Belmontes] was convicted on extremely strong evidence that he committed an intentional murder of extraordinary brutality. He bludgeoned McConnell to death with an iron dumbbell bar; the force of the 15 to 20 some-odd blows leaving her with gaping wounds and a cracked skull. Her defensive wounds plainly evidenced a desperate struggle for life at defendant's hands. The murder occurred in the course of a calculated plan to burglarize the victim's home; to which defendant had gained entry on false pretenses. After the murder, defendant and his accomplices callously fenced the victim's stereo components for $100—purchasing beer with a portion of the proceeds.

*People v. Belmontes*, 755 P.2d 310, 354 (Cal. 1988).

In the penalty phase of his trial in state court, the jury considered the circumstances of Belmontes's crime and the other aggravating evidence, balanced the evidence against the mitigating factors, and sentenced Belmontes to death.[1] Unanimously affirming Belmontes's conviction and sentence, the California Supreme Court stated: "The properly admitted aggravating evidence in this case—in particular, the circumstances of the crime—was *simply overwhelming*."[2] *Id.* at 809 (citation omitted and emphasis added).

Now our court orders grant of habeas, faulting the state jury's verdict on grounds of ineffective assistance of counsel. Recharacterizing the aggravating evidence as "minimal," the majority claims that Belmontes was prejudiced by his counsel's failure to present certain available mitigating evidence to counterbalance the aggravating evidence presented by the state. Maj. Op. at 6745. The majority also concludes that Belmontes's counsel failed to prepare adequately the penalty phase witnesses. In order to discern prejudice, the majority overstates the mitigating evidence, understates the properly admitted aggravating evidence, and ignores the further aggravating evidence that would have come in on rebuttal. With all due respect, I must dissent.

---

[1]California law requires the trier of fact to consider eleven factors in the penalty phase, insofar as they are relevant: (a) the circumstances of the crime, (b) the defendant's use, attempted use, or threat of force, (c) the defendant's prior felony convictions, (d) the defendant's extreme mental or emotional disturbance, (e) the victim's participation or consent, (f) the defendant's reasonable belief that his actions were morally justified or extenuated, (g) the defendant's extreme duress or substantial domination by another person, (h) the defendant's mental disease or defect, or the effects of intoxication (i) the defendant's age, (j) the defendant's minor role, and (k) "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal. Penal Code § 190.3.

[2]Appellate counsel for Belmontes, in contrast, considers the crime "objectively low on the scale of heinousness."

# I

## A

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that his counsel's performance was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 693 (1984). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697. Prejudice exists only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The majority concludes that Belmontes has shown both deficiency and prejudice, but its analysis deprives the prejudice requirement of meaning. After holding the penalty-phase performance of John Schick, Belmontes's trial counsel, to be deficient, the majority concludes that the missing mitigating evidence would have had a reasonable probability of changing the jury's verdict. In recounting the aggravating evidence, Maj. Op. at 6745-47, the majority fails to mention the circumstances of the crime—although the first factor California law requires the jury to consider when setting the penalty, *see* Cal. Penal Code § 190.3, *supra* note 1. Even worse, the majority ignores the devastating aggravating evidence that would have been admitted on rebuttal.

In particular, the prosecution would have shown that Belmontes had murdered Jerry Howard in 1979. Howard's body was found in a secluded, semi-rural area. He had been executed with a bullet to the back of the head. A parole report prepared for Belmontes on May 11, 1979, remarked that "the method in which the murder was carried out indicate[d] plan-

ning, sophistication, and premeditation." Witness testimony offered strong evidence against Belmontes. However, "because of lack of cooperation on the part of the witnesses, [Belmontes] could not be tried for murder."[3] Still, the police could prove that Belmontes possessed the gun used to kill Howard, so Belmontes agreed to plead to a charge of accessory after the fact to voluntary manslaughter. The police remained convinced of his principal role.

Once shielded from prosecution by double jeopardy, Belmontes confessed to several persons that he had shot Howard. While investigating Belmontes's criminal history in preparation for the McConnell murder trial, both Schick and the district attorney discovered that these persons, unlike the witnesses in 1979, were willing to testify. They included Belmontes's case worker at the California Youth Authority ("CYA"), Charles Sapien, who told the district attorney in 1982 that Belmontes had confessed to shooting Howard. Sapien recounted that Belmontes had denied the crime during his incarceration at CYA, but had confided to Sapien upon his release that he had "wasted that guy."[4] Another witness was Steven Cartwright, who informed the district attorney that Belmontes had confessed to him that he had killed Howard, but that in 1979, Belmontes's mother had begged him not to testify. Another witness was Detective Jake Donaldson, a longtime friend of the Belmontes family, who told Schick's investigator that the Howard killing "was definitely an execution type murder with [Belmontes] being the principal involved." Belmontes does not deny the truth of this evidence.

---

[3]Police records revealed that two days after the crime the police had received a call from an anonymous informant that Belmontes had stated: "I shot that guy in the head." Another anonymous call informed the police that Belmontes had been seen with Howard just before Howard was killed. Other witnesses contributed circumstantial evidence.

[4]Sapien explained that Belmontes believed Sapien had aided him obtaining parole, because Sapien had written and presented to the parole board the final report before it granted Belmontes's release.

The prosecutor at Belmontes's 1982 trial was ready to present these witnesses and other evidence of Belmontes's criminal history. However, the court granted Schick's motion to limit the extent of testimony to the crime of conviction: accessory after the fact to voluntary manslaughter.

Both parties were aware, however, that the trial court might admit the Howard evidence for other purposes, such as to rebut or to impeach testimony of character witnesses for the defense. *See* Cal. Evid. Code § 1102(b) (permitting the prosecution to use character evidence, including prior bad acts, "to rebut evidence adduced by the defendant"). The trial transcript substantiates the risk cross-examination posed to the defense. At one point, the defense attorney inadvertently elicited testimony from Belmontes's friend Robert Martinez that Belmontes was not a violent person. Outside the hearing of the jury, the prosecutor informed defense counsel and the court that he intended "to cross-examine [Martinez] fully about his knowledge of other violent actions done by Mr. Belmontes" unless the court struck the evidence from the record. He noted that "counsel was well aware of all the witnesses I have lined up to testify to [Belmontes's violent past]."[5] The court agreed: "*I'm going to have to allow him to go into the whole background if we don't do that.*" (emphasis added). Schick immediately acquiesced; the judge ordered Martinez's character testimony stricken from the record and admonished the jury to disregard it. This incident leaves little doubt that the court was ready to admit the Howard evidence for rebuttal or impeachment.

When later deposed, Schick confirmed that the Howard

---

[5]He stated that he would test the witness's knowledge of the facts that as a young man, Belmontes attempted to seize a police officer's gun during an arrest, that he carried a gun to school because he was having trouble with schoolmates, that he was a member of the Black Angels gang in Ontario, California, and that he murdered Jerry Howard. The record shows that the prosecution had extensive files to back up these allegations.

evidence had given him "grave concerns" and that he had structured his arguments and witnesses to avoid its admission.[6] He told habeas counsel that the prosecution had intended to call Detective Donaldson, who would have testified to the "cold-blooded fashion" in which Howard had been killed. When asked whether he believed such evidence would be "devastating," Schick said: "Certainly."

But, Belmontes now argues that the trial court would not have allowed the evidence because it was not relevant to impeach expert testimony regarding Belmontes's prospects for nonviolence in an *institution*. Yet for a mental state expert to determine whether Belmontes had a lesser proclivity toward violence when supervised, she would have needed to compare his behavior in both institutional and non-institutional settings.

Moreover, the manner in which Belmontes killed Howard would have been relevant to his institutional prospects directly, insofar as it manifested aspects of his personality. The defense supported its claim that Belmontes would be nonviolent in prison with evidence that a well-respected psychological test[7] suggested that he had the personality of a "conformer." To rebut an expert's interpretation of that test, the prosecutor could have asked whether the expert was aware that Belmontes had taken a leadership role in the murder of Jerry Howard or had helped establish a Chicano gang while incarcerated—acts that suggested an aggressive personality and undermined the claim that he would be a conforming and rule-abiding inmate.[8]

---

[6]Schick stated that he "would have expected" the prosecutor to introduce "[s]pecific facts of the case" to rebut expert testimony about Belmontes's propensity for violence.

[7]Both parties' experts testified that they considered this test, the "Jesness" test, a valuable one.

[8]Dr. Yates testified that if she were to diagnose Belmontes based on the evidence gathered for habeas purposes, she would deem him to have a "socialized aggressive disorder," based on "evidence of [his] social attachments and "repetitive pattern of physical violence and thefts."

B

The majority bifurcates its analysis in an attempt to avoid the minefield of Belmontes's criminal history. While it concedes that Belmontes's violent acts, might be admissible if Belmontes asserted a likelihood of nonviolent prison adjustment, it declines to consider that issue on the ground that the other mitigating evidence suffices to establish prejudice. This approach simply leads the majority into a neighboring minefield: the circumstances of the Howard murder would have been admissible to rebut the other mitigating evidence as well.[9]

The majority states that "Schick should have offered the testimony of a psychologist or psychiatrist in order effectively to explain to the jury in day-to-day terms the practical impact on an individual of the kind of traumas that Belmontes experienced as a child and adolescent." Maj. Op. at 6823. Had Schick done so, the prosecution could have cross-examined such expert as to the basis for her opinion. California law provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) *the matter upon which his or her opinion is based and the reasons for his or her opinion*." Cal. Evid. Code § 721(a) (emphasis added). If Schick had placed on the stand an expert to "explain[ ] the extent to which [Belmontes's childhood] problems can cause or contribute to a change in individuals that can lead to subsequent criminal conduct," Maj. Op. at 6823, the expert would have needed to know the criminal conduct in which Belmontes had engaged. The Howard murder evidence would have been admissible to

---

[9]As Belmontes argued in his amended habeas petition before the district court: "Moreover, and of paramount importance, the same mental state evidence which mitigates his role in the offense itself would have provided a compelling presentation regarding *future* conduct if given a life sentence rather than the death penalty." (emphasis in original.)

show the basis for the expert's opinion or to reveal the expert's failure to consider relevant acts in Belmontes's history.

The Howard evidence would also have been relevant to question expert testimony as to Belmontes's mental state at the time of McConnell's murder. The majority asserts that "[b]y the time of McConnell's murder—indeed earlier than then—[Belmontes] was regularly using marijuana, heroin, LSD, PCP and other drugs." The Howard evidence would have been relevant to rebut any insinuation that the McConnell murder was in any way affected by Belmontes's drug use.[10] Dr. Yates explained that an expert could have opined whether Belmontes had "an antisocial personality disorder or simply [was] a conformist individual who was under special stress at the time." If the expert had suggested that Belmontes lost control and awareness of his impulses due to drugs or alcohol, the Howard evidence could have shown that Belmontes committed a similarly "cold-blooded" murder without such influences.

---

[10]The majority states that it is not making a factual finding, inappropriate at the appellate level, as to whether Belmontes was influenced by drug use. Maj. Op. at 6794 n.18. Additionally, it states that "the district court did not hold that humanizing evidence about Belmontes's history of substance abuse before the crime would likewise open the door to additional aggravating evidence." *Id.* However, I am at a loss as to how Belmontes's drug use would be humanizing without some reference to its effect on his commission of a cruel and brutal crime or his ability to adjust to prison life without being a danger to others. Although the majority argues that the drug use evidence is humanizing because it shows that he used drugs "to help cope with the unpleasant circumstances of his life," without some sort of connection to the crime itself or a "major personality change," compare *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998), such mitigating evidence is of little relevance, and perhaps not mitigating at all. *See* Maj. Op. at 6770 (explaining that lack of expert testimony was significant because there was no "expert who could make *connections* between various themes in the mitigation case and explain to the jury how they could have *contributed* to Belmontes's involvement in criminal activity" (emphasis added)).

Therefore, far from leading to prejudice, the omission of expert mental-state evidence saved Belmontes from devastating cross-examination evidence. As Schick explained:

> [I]t bec[ame] apparent that the amount of evidence the prosecution was trying to introduce in this penalty trial, should we get there, was growing in leaps of bounds [*sic*]. . . . [Belmontes's prior convictions] were somewhat small in my mind next to the other factors, all of which related to this 1979 homicide of Jerry Howard. Because, as I said, it was very clear to me that what [the prosecutor] wanted to do was retry that case, put all the evidence before the jury.

Schick noted that the prosecutor's damaging evidence was compounded

> [by] the statement [Detective Donaldson] made to [the defense investigator] that it was his . . . view that Mr. Belmontes had done that killing in 1979 in a cold-blooded fashion. And what [the prosecution] wanted to do was explain that point of view . . . and at the conclusion of it get up to the jury and say, "Here is a man who has been convicted not once but twice of murder." That's a whole different kettle of fish. . . . getting back to your question, yes, I was concerned. That was my concern.

## C

Our precedent recognizes that counsel's concern for opening the door to rebuttal can defeat a claim of ineffective assistance of counsel. In *R. Campbell v. Kincheloe*, 829 F.2d 1453 (9th Cir. 1987), counsel had presented no mitigating evidence, yet we defended that omission:

> The record shows that the state was prepared to present a vast array of aggravating evidence in rebuttal,

including the forcible rape of Campbell's ex-wife.
. . . Faced with the choice of limiting the state to a
relatively tame presentation of Campbell's prior con-
victions, or potentially opening the door to devastat-
ing rebuttal evidence, Campbell's counsel chose the
former route by electing not to present mitigating
evidence. In one of the attorney's words,
"[p]resentation of those [mitigating] items in my
mind would bring forth a parade of horribles that in
my opinion would so far bury those factors in miti-
gation that any chance we had of saving his life
would have been lost."

*Id.* at 1462 (emphasis added). We noted that the defendant,
like Belmontes,

concede[d] that some of his potential mitigating evi-
dence would have been met with strong rebuttal evi-
dence from the state, but he speculate[d] that
evidence of his "background, childhood and family
relationships," and possibly evidence of his "child
abuse, upbringing and drug abuse," could have been
presented without opening the door to rebuttal evi-
dence.

*Id.* Still, we found no prejudice: "Even if this is the case, we
agree with the district court that 'given the overwhelming
aggravat[ing] factors,' and 'the heinous nature of the crime,'
there is no reasonable likelihood that the jury's verdict would
have been different had the mitigating evidence been intro-
duced." *Id.*

Here, as in *Kincheloe*, the state was prepared to present a
vast array of aggravating evidence in rebuttal, including Bel-
montes's execution-style murder of Howard, his history of
drug dealing, his conflicts with police, and his participation in
gang activities. Even without that further aggravating evi-

dence, the circumstances of the crime already were "simply overwhelming."

Furthermore, the majority's attempt to avoid the issue of rebuttal evidence requires it to also ignore mitigating evidence that Belmontes himself deemed crucial: evidence that Belmontes would be non-violent in prison. As Belmontes stated in his amended habeas petition in the district court:

> Common sense tells us that a rational jury will be extremely reluctant to award a life sentence if it would be exploited as a license to assault or kill again. In contrast, a life sentence becomes far more palatable to a jury which can satisfy their primary interest in removing the defendant from open society with some certainty that he will not replicate violent offenses in prison society.

In the face of the gruesome circumstances of the crime and the already-admitted evidence of Belmontes's prior violent acts, the jury would not have had such certainty unless Schick introduced evidence of his non-violent potential. Because he was unable to do so without opening the door to devastating rebuttal evidence, the omission of such evidence was not prejudicial.

## II

### A

The mitigating effect of the omitted evidence would not have created a reasonable probability of altering the sentence. First, one must distinguish between evidence that was already presented, and evidence that was never admitted. The majority intermingles the two, leaving the impression that Schick omitted mitigating evidence that he in fact presented to the jury. For example, Schick presented numerous penalty phase witnesses to "humanize" Belmontes and to show that, despite

a difficult background, Belmontes could relate to others.[11] He called to the stand Belmontes's mother, grandfather, his friends Darlene and Robert Martinez, Rev. Dale Barrett (chaplain at CYA Pine Grove Facility), the Haros (members of Rev. Barrett's church), and Don Miller (assistant chaplain at the CYA Preston Facility).

The majority considers the testimony of these witnesses to be of little value compared to the testimony that Schick could have presented. In particular, the majority objects that "[a]t no point did Schick mention any of the traumatic experiences that Belmontes underwent during his childhood or his youth," thereby "fail[ing] to explain to the jury how those experiences affected Belmontes; what the relationship was between the tragic events and Belmontes's subsequent criminal conduct; and why the jury should consider those circumstances in determining whether Belmontes was an individual who should be put to death or whose life should be spared." Maj. Op. at 6758-59. But the majority fails to give proper emphasis to the fact that several witnesses testified on those issues: Belmontes's mother spoke of how Belmontes's father used to beat her, once breaking her arm, and another time stabbing her and of how Belmontes suffered from the departure of her second husband and became "difficult to control." Belmontes's grandfather described how his grandson cared for his grandmother, visiting her every day in the hospital and attending her funeral. The jury did not need an expert to understand that these experiences had a negative impact on Belmontes.

---

[11]Schick explained that his four goals in the penalty phase were (1) to "humanize" Mr. Belmontes for the jury; (2) to show that he would not be a difficult prisoner and that he could form good relationships with people; (3) to show his background to the jury so that it would know what his life had been like; and (4) to raise lingering doubt whether Belmontes was really the actual killer by offering evidence of Vasquez's agreement to testify for the prosecution to obtain a lighter sentence.

## B

Nor was Belmontes prejudiced by the lack of expert testimony about his rheumatic fever. Dr. Yates characterized that illness as "pretty mild," rather than "significantly debilitating," as the majority asserts. She clarified that "[a]ctually, it was the mother that expected him to die early, but [Belmontes himself] didn't."[12] According to Dr. Yates, the illness "wasn't very severe, it was associated with [ ] arthritis, but not with anything more ominous and he probably shouldn't have had a home teacher."[13] Dr. Missett similarly stated that Belmontes "did not face an illness that was going to result in imminent death."

Belmontes never was diagnosed with a depressional disorder. In fact, Dr. Yates stated that it would have been inappropriate to diagnose Belmontes with a depressional disorder, attributing his unhappiness during home-schooling to "a situational depression, which . . . just means that it's not a good situation and he doesn't like it and doesn't feel good about it." Dr. Missett opined that certain events in Belmontes's childhood corresponded with a form of "symptomatic" depression. For example, he remarked that "[i]f [Belmontes was] to be believed about his visits to [his infant sister's] grave, this would have been an indication of an early essentially childhood depression." And he stated that the "description of [Belmontes] not liking school and the feeling of not getting much out of it [to be] consistent with his having a symptomatic childhood depression." Those triggering causes for depression offered little reason to believe the depression was serious or debilitating.

---

[12]Dr. Missett also noted that he was not sure whether Belmontes, or his mother, believed that Belmontes would die before age 21.

[13]She also noted that she "s[aw] no reason why he was so impaired that he couldn't go to school" and speculated that "it may have been coming more from the mother than any [medical necessity]."

On the other hand, Dr. Missett did suggest that Belmontes's sickness as a child might have led to his later use of drugs: "Belmontes's drug abuse appears to have had its onset during and immediately after the period of time that he was so repeatedly physically ill." He opined that Belmontes might have used drugs as a form of "self-medication." Although this evidence might have led the jury to pity Belmontes, the prosecutor could have brought in damaging evidence on cross-examination. For example, the prosecutor could have queried of such expert whether depression also induced Belmontes to *deal and to distribute* drugs. That rebuttal evidence would have undercut Schick's efforts to transform Belmontes's drug-related conduct into a cause for sympathy.[14]

## C

Belmontes's drug use would not have carried much weight to humanize him as the majority would suggest. When deposed for habeas purposes, Schick's trial mental-state expert, Dr. Cavanaugh, opined that Belmontes had a "clear mental status at the time of the incident [murder of McConnell]." He stated that Belmontes claimed to have been high on drugs shortly before the crime, and yet his "recounting of the events leading up to this murder was very, very detailed"—a detailed description inconsistent with a person whose actions were influenced by drugs.[15] Moreover, the way in which the crime was planned and committed indicates forethought and control: Belmontes armed himself with a metal bar and put on

---

[14]A police report dated March 1, 1979, described how surveillance officers witnessed Belmontes give two balloons of heroin to the confidential informant. After Belmontes parted company with the confidential informant, the informant gave the officers the heroin. He told them that he had promised to try to find an "outfit" (heroin injection paraphernalia) for Belmontes and that Belmontes had warned him that he was armed, had committed at least one murder, and had shot people on two different occasions.

[15]Other witnesses corroborated the accuracy of Belmontes's detailed description.

gloves[16]; after the crime, Belmontes had the lucidity to discard the bloody weapon in a river.

Dr. Yates thought that the evidence of Belmontes's mental state at the time of the crime could cut either way. On the one hand, his careful preparation and execution of the crime suggested that he retained self control and that his brutal act was representative of his general personality. On the other hand, Belmontes "could have been very impulsive at times." If he were "under the influence of substances," Dr. Yates remarked, "[h]is anger could have broken through, even though it wasn't his ordinary way of acting and feeling and thinking, he could have done something that was horrible." (emphasis added). The prosecution could have impeached such testimony regarding Belmontes's "*ordinary way of acting and feeling and thinking*," and asked whether that opinion took into account the fact that Belmontes had killed Howard without any evidence of drug or alcohol intoxication. Again, any effort to lessen Belmontes's culpability for the crime would have either been weak or counterproductive.

D

If Schick had offered expert testimony to show that Belmontes's childhood experiences harmed his ability to interact with others, such testimony would have led to similar rebuttal evidence. For example, Dr. Missett stated Belmontes's grandfather expressed anti-Latino sentiments toward Belmontes's father, causing Belmontes a sense of "inferiority and lower self-esteem." He opined that it became "difficult [for Belmontes] to mainstream himself socially or racially into a mixed situation or a largely Anglo situation at school." Such testimony might have explained why Belmontes decided to join gangs. But Belmontes was not prejudiced by the lack of

---

[16]Belmontes himself told Dr. Yates about the gloves, which he stated he always wore to "do a job."

such explanation, since Schick succeeded in keeping out evidence of gang relations altogether.

The majority also contends that Schick should have introduced mitigating evidence to show Belmontes's difficult childhood and to emphasize the abuse in the family. However, Belmontes's mother had already testified to being beaten by Belmontes's father. And as a psychological expert, Dr. Missett found it significant that Belmontes never asserted that he had witnessed his father hit his mother. Even now, Belmontes offers no evidence as to how the abuse impacted him and never states that he was abused himself.

Furthermore, several witnesses noted positive aspects of Belmontes's family relationships. Belmontes's sister recounted how she and Belmontes went to their father's on Sundays and "spent the whole day together." She remembered the days positively, but noted that they "never did much because he never had any money." When asked whether the financial problems of the family caused Belmontes psychological harm, Dr. Missett opined that the "father's inability to hold a job even in the face of [ ] poverty," caused Belmontes a "level of shame." It is not clear, however, how much that "shame" affected Belmontes or his relationships, for his sister noted that he "had lots of friends."

Having painted Belmontes's childhood in the darkest possible light, the majority attempts to cite sickness and poverty and family troubles as the reason why he became a violent murderer. The majority notes that witnesses who knew Belmontes as a child described him as a "sweet" boy who was polite and pleasing. And as a psychological expert, Dr. Missett noted that Belmontes was "extremely well socialized" and had "a very well-developed capacity to function in a socially attractive way by the time the he [wa]s entering adolescence." The majority cites these positive features of Belmontes as a child to support its assumption that external factors, and not

volition, can be blamed for Belmontes's criminal transformation.

The majority's suggestion that Belmontes's rheumatic fever caused so dramatic a change in his personality is undermined by the "pretty mild" characterization of that illness by Dr. Yates. And Belmontes's own sister stated that she "did not notice or understand emotional changes in him" due to his illness—"He was the same easygoing person in the way he related to [her]." And while the majority contends that Belmontes suffered from having to move into a single motel room, his sister recounted that Belmontes "did not stay at the [ ] motel very much." The majority's suggestion that the jury would have considered Belmontes less culpable for McConnell's murder, had they known further details about his childhood, is simply implausible.

E

The cumulative effect of Belmontes's childhood experiences would have offered little antidote to the "overwhelming" evidence of Belmontes's later drug trafficking, involvement in gangs, assault on his girlfriend while she was pregnant, and multiple murders. Schick's failure to offer further testimony about Belmontes's childhood experiences was not prejudicial. Even if the jury remained ignorant of the chilling Howard murder, the aggravating evidence presented overwhelmed any benefit of the omitted mitigating evidence. The jury would not have forgotten Belmontes's brutality, evidenced by the autopsy photos of McConnell's mangled head. The jury would have recalled Belmontes's testimony that he and his friends left McConnell's bloody body and drove to a place where they could sell her belongings and buy beer. The jury still would have had no explanation for why, even in his closing address, Belmontes expressed no remorse.

III

A

Contrary to the majority's claim, neither *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc), nor *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), supports its conclusion.

*Mayfield* involved a claim of ineffective assistance in a capital sentencing. The majority deems the facts in *Mayfield* nearly identical to those at bar, with only two significant differences: In *Mayfield*, the aggravating evidence was "strong" and the mitigating evidence introduced was "substantial"; here the state conceded that the aggravating evidence was "scant" and the mitigating evidence introduced was "insubstantial." Maj. Op. at 6805-06. The majority's statement with respect to the strength of the aggravating evidence distorts the state's reference, which characterized the aggravating evidence *other than the circumstances of the crime*.[17] When the circumstances of the crime were considered in context, the prosecutor made clear that the death penalty was appropriate.

Moreover, the deficiency of Mayfield's counsel was marked and clearly consequential. Mayfield's counsel spent only 40 hours on the entire trial and waived opening argument in the penalty phase. Mayfield alleged that he had been influenced by drugs at the time of the offense, but his counsel "mistakenly stipulated that [his] urine tested negative for PCP the day after the crime, indicating to the jury both that Mayfield did not have a substance abuse problem and that Mayfield had lied about it." *Id*. The lawyer called only one witness at the penalty phase. *Mayfield*, 270 F.3d at 928. Although important,[18] this witness's testimony revealed only a fraction

---

[17]The majority argues that I have incorrectly interpreted statements made by the State at oral argument, however, on this point my colleagues and I will simply have to disagree. Maj. Op. at 6802 n.21.

[18]The witness, a doctor, testified that Mayfield had been diagnosed with diabetes at age nine, suffered from a childhood behavioral disorder caused

of the mitigating evidence available to Mayfield. At a later state evidentiary hearing on habeas, Mayfield's family members, none of whom testified at trial, described how Mayfield was born to a 15-year-old mother and grew up in the projects. They recounted his growing emotional disturbance as he "began drinking and smoking marijuana to fit in with the tough kids of the San Bernardino projects" and started using PCP. *Id.* at 931. Friends and siblings explained that his "personality changed as a result of his drug and alcohol abuse and his poorly controlled diabetes," *id.* at 931, and that he became "incorrigible and occasionally had physical altercations with [his mother]."

Experts at the later proceeding verified that Mayfield had been "diagnosed with childhood behavioral disorder and depression" and described how "[a] psychological evaluation indicated that, although he had low-normal IQ, 'he actually performed as though he were *mildly retarded.*' " *Id.* (emphasis added). A psychiatrist explained that " 'a growing onslaught of catastrophes, losses, and increased emotional turmoil . . . ma[de] it more difficult for him to figure out what is the best thing to do and how to control his emotions.' " *Id.* An endocrinologist detailed the impact of Mayfield's long-term fight with diabetes, including comas and hospitalizations as frequent as five times a month. This evidence might well have engendered the sympathy of Mayfield's jury, had it been presented.

Mayfield also had significant positive character evidence— evident in his case—that would not have opened the door to

by depression, and began using PCP in his late teens and that his "mental state deteriorated because of drug usage." *Id.* at 929. The doctor also revealed that Mayfield repeatedly had expressed remorse and he recounted that others described Mayfield as a gentle person and the crimes to be out of character. Unfortunately, the mitigating effect of the doctor's testimony was undermined by his erroneous statement that Mayfield "was not under the influence of drugs or alcohol the night of the crimes." *Id.* at 930.

devastating rebuttal evidence. Witnesses described Mayfield as "helpful and generous" and recounted that he had looked after his younger brother and sister and had routinely assisted his wheel-chair bound uncle. *Id.* at 932. Other witnesses told how Mayfield had aided them to overcome personal struggles, how he loved his son, how he interacted well with children, and how he was not a violent person. *Id.* Finally, they stated that they loved Mayfield and wished that his life would be spared. *Id.*

Belmontes had nothing close to this mitigating evidence. Unlike Mayfield's documented brain damage from physical and mental disorders, Belmontes had "pretty mild" rheumatic fever and "situational" or "symptomatic" childhood depression. In contrast with the evidence suggesting that Mayfield devoted enormous amounts of time to actively assist others, Belmontes's mother stated that he used his illness as an excuse to be lazy.[19] Mayfield and Belmontes both abused drugs, but Belmontes also dealt them.[20] And while no family or friends were presented to testify to the positive aspects of Mayfield's character, Belmontes had several witnesses who testified on his behalf and still the jury found their words insufficient to justify mercy.[21]

---

[19]Belmontes's parole agent at CYA recorded this statement in a report on June 13, 1979.

[20]Belmontes's girlfriend and the mother of his child, Barbara Murillo, stated that Belmontes did not use drugs, because they were bad for his illness. Police reports included witness statements and documentation that Belmontes engaged in drug dealing.

[21]As the defense investigator discovered, several persons who knew Belmontes as a youth had only negative things to say. Members of the Detective Staff at the Ontario Police Department (who investigated the Howard murder) "felt that [Belmontes's] mother was very over-protective of her son and other siblings." They noted his reputation as a "heavily involved" member of the Black Angels gang, and stated that he had "a long history of anti-social behavior" and was "very fortunate that he ha[d] not been caught" for the crimes he had committed. Belmontes's probation officers indicated similar sentiments and noted that he was "very manipulative," a characterization corroborated by several psychiatric experts.

The majority complains that the witnesses did not show "Belmontes's positive attributes": that "he was a kind, responsible, and likeable child who got along well with his siblings, was respectful towards his grandparents despite their disapproval of his mixed racial background, participated in community activities, kept up in school and got along with his teachers before his illness, and made friends easily." Maj. Op. at 6792. But several aspects of Belmontes's positive childhood characteristics *were* presented: Belmontes's mother told the jury of his "close" relationship with his sister, his grandfather spoke of Belmontes's devotion to his grandmother, the jury had learned that Belmontes had assumed a leadership position on his CYA fire crew and had joined the "M2" religious program while in CYA custody. The remaining evidence that could have been presented would have added little: Belmontes was involved in Sea Cadets and little league and many adults found him to be a polite child with a pleasant demeanor.[22] Third, evidence that Belmontes "kept up in school" could have been impeached by noting that he was a high-school drop-out.[23]

Even more importantly, we distinguished the facts in *Mayfield* from the situation where new mitigating evidence would open the door to additional aggravating evidence. Specifically, we cited the Fifth Circuit's holding in *Williams v. Cain*, 125 F.3d 269, 278-280 (5th Cir. 1997), in which the court rejected an ineffective assistance of counsel claim because "[the omitted] testimony *could have opened the door* to testimony regarding [the defendant's] drug use, expulsion from

---

[22]At the same time, the fact that he brought a gun to school because he was having trouble with classmates suggested that his relationships with his childhood peers were not as favorable as the majority would suggest. There is little doubt the prosecution could have brought that incident in as rebuttal to evidence of Belmontes's positive character as a child.

[23]An attempt by the majority to attribute this decision to leave school to Belmontes's rheumatic fever would be contradicted by Dr. Yates's statement that she saw no reason why Belmontes had to leave school even in the worst period of his illness.

school, and discharge from [a] job [and] such testimony 'would have had little mitigating effect against the aggravating evidence.' " *Mayfield*, 270 F.3d at 938 (emphasis added). The only such rebuttal evidence in *Mayfield* related to Mayfield's mother's awareness of "an incident in which Mayfield may have engaged in inappropriate sexual conduct with his infant sister when he was twelve." *Id.* at 928. Had her testimony been the only available testimony, we agreed that this risk "argue[d] against a determination of prejudice." *Id.* However, counsel had failed to present *any* testimony by family or friends, although "family members, except for Mayfield's mother, *did not have damaging testimony.*" *Id.* (emphasis added).

Belmontes's case differs from *Mayfield* because the mitigating evidence Schick could have presented would have elicited a plethora of aggravating rebuttal evidence—evidence that leaves little doubt that the net effect of the additional testimony would have been negative.

Belmontes has not made the required showing of prejudice. There was no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The majority's discordant conclusion conflicts with *Strickland* and manifests disagreement with governing precedent. "Unless a defendant makes both showings [of deficiency and prejudice], it cannot be said that the . . . death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. The majority's view appears to adopt a "*per se* rule that we must reverse a death sentence if we find that counsel's performance at the penalty phase was deficient"—a rule we have expressly rejected. *Mayfield*, 270 F.3d at 928 (citations omitted).

B

Nor can I accept the majority's facile analogy of this case to *Douglas*, 316 F.3d at 1079. Contrary to its assertion that

"[t]he facts of the case at hand and those in *Douglas* are quite similar," Maj. Op. at 6781, the two cases differed in crucial respects.

The aggravating evidence in *Douglas* was powerful: Douglas killed two teenage girls after torturing them and forcing them to commit sex acts. *Douglas v. Woodford*, 316 F.3d at 1079, 1083 (9th Cir. 2003). The omitted mitigating evidence, however, was also powerful: Douglas had been orphaned and placed in foster care; his alcoholic foster father locked him in a closet for long periods of time, causing him permanent claustrophobia. After running away at 15 to join the Marines, "Douglas was arrested and put in a Florida jail where he was beaten and gang-raped by other inmates." *Id.* at 1088. Later, Douglas got in a car accident that left him with permanent brain damage. Despite these traumatic experiences and their documented harm to his mental capacity, Douglas had acted heroically even in his older years: he had medals and commendations from the Marines, and witnesses testified that he had saved the lives of two drowning sailors. *Id.* Our conclusion in *Douglas* was based on a reasonable probability that the jury would have spared Douglas his life, had it known these sympathetic facts.

In *Douglas*, as in *Mayfield*, we confronted no risk that devastating aggravating evidence would enter on cross-examination. The available aggravating evidence against Douglas *had already been presented*. The case does not compare to *Belmontes*, where the prosecution had found a skeleton in the closet, and was waiting for Belmontes to open the door.

IV

Equally troubling is the majority's conclusion that Schick's preparation of the penalty phase witnesses was inadequate and prejudicial. The majority states that:

> In addition to failing to investigate adequately,
> Schick did little to prepare the lay witnesses he cal-
> led to testify. . . . *It is evident* from the testimony
> given at the penalty phase that Schick did not . . .
> [prepare the witnesses]. . . . Several of the witnesses
> who knew Belmontes best . . . *did not testify to a sin-
> gle positive quality he possessed.*

Maj. Op. at 6785 (emphasis added). Without any meaningful discussion of Schick's actual preparation of the witnesses,[24] the majority assumes that the limited appeal of the witnesses's testimony reflects a lack of coaching.

The majority does not explain what positive qualities were not mentioned, but could have been illuminated. Belmontes's mother already had told the jury that Belmontes had a close relationship with his sister.[25] His grandfather had described Belmontes's faithfulness to his grandmother. His friends Robert and Darlene Martinez had described their close relationship. Rev. Barrett and the Haros had described the sincere religious commitment Belmontes made during his CYA incar-

---

[24]This same failing is reflected in Belmontes's argument. He focuses on the resulting testimony, without describing what Schick did or did not do to prepare the witnesses. He states that Belmontes received "virtually no support from his obviously nervous and tongue-tied mother" and concludes that the "presentation [of the mother] fell in the same range between 'woefully inadequate' and 'deleterious.' " But we have no reason to believe that the mother's nervousness on the stand was the result of inadequate preparation.

[25]Belmontes argues that the mother should have been shown "photographs of [Belmontes] actually involved in positive activities as a youth, and [been asked] to identify and describe the contents for the jury." But counsel enjoys "wide latitude . . . in making tactical decisions," such as selecting which evidence to present to make the most compelling argument. *Strickland*, 466 U.S. at 689-90. In any case, Dr. Yates aptly noted that the photographs might not have represented such positive moments: "The pictures are a very small slice of what happened and usually it's a family affair when people are saying, well, smile now and that's not necessarily characteristic of anything that goes on in the family."

ceration. Finally, Miller had testified to Belmontes's ability to make a positive contribution while in prison.[26]

The majority faults Schick for allowing the witnesses to state that they believed Belmontes was innocent. Although such view contradicted the jury's guilty verdict, Schick's failure to stop the witnesses from so testifying was not objectionable. In fact, this testimony may have had a mitigating effect, because it allowed Schick to present positive character evidence indirectly, without opening the door to a damaging rebuttal. It is hard to imagine that the witnesses's implication that Belmontes was normally not a violent person prejudiced Belmontes's hope for leniency.

V

For the third time, the majority has granted Belmontes habeas relief without the requisite legal or factual support. The mere desire for mercy toward a man found guilty of capital murder, however admirable, provides no legal ground to disturb the jury's sentence of death. Again, I must dissent.

---

[26]The majority's analysis erroneously assumes that the witnesses' testimony required explanation: "Although Schick stated in his deposition that one of his four themes at the penalty phase was Belmontes's capacity to adjust well to prison, he failed to argue that such was the import of the testimony of any of the witnesses he had called to testify." Maj. Op. at 6787. But much of what the witnesses said conveyed a clear mitigating message on its own. For example, Miller said that Belmontes had returned on several occasions to speak to later CYA wards and to offer them motivating advice. Miller explained that he believed Belmontes could offer similar encouragement and inspiration to fellow prison inmates. The jury did not need Schick to explain "the import of th[at] testimony." *Id.*